**ROYAL SURPLUS LINES INSURANCE COMPANY, Plaintiff,**

v.

**SOFAMOR DANEK GROUP, INC., Defendant.**

No. 97–2499–GV.

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 5, 1999.

Order on Motion for Protective
Order March 17, 1998.

Order on Reconsideration July 31, 1998.

Linda J. Mowles, Alan M. Parker, David L. Beck, Michael S. Pemberton, Lewis King Krieg Waldrop & Cantron, Knoxville, TN, Michael B. Neal, Krivcher Magids, Memphis, TN, Aaron Wyckoff, Lewis King Krieg Waldrop & Catron PC, Nashville, TN, for Royal Surplus Lines Insurance Co.

William C. Bateman, Jr., Scott B. Peatross, Bateman Gibson & Childers, Memphis, TN, William P. Kardaras, Peter W. Kardaras, Cooper Kardaras & Scharf LLP, New York City, for Insurance Company of the State of Pennsylvania, New Hampshire Insurance Company.

Lee J. Chase, III, Larry Montgomery, Glankler Brown Gilliland Chase Robinson & Raines, Memphis, TN, for Sofamor Danek Group, Inc.

J. Richard Buchignani, Nanette L. Wesley, Wyatt, Tarrant & Combs, Memphis, TN, for Sedgwick James of Tennesssee, Inc. and Douglas W. Pera.

## ORDER AFFIRMING THE MAGISTRATE JUDGE'S MARCH 17, 1998 AND JULY 31, 1998 ORDERS ON DISCOVERY

GIBBONS, District Judge.

Before the court are plaintiff Royal Surplus Lines Insurance Company, defendant Sofamor Danek Group, Inc., and nonparties Sedgwick of Tennessee, Inc. and Douglas W. Pera's objections to and appeals of the discovery orders entered by Magistrate Judge Diane Vescovo on March 17, 1998 and July 31, 1998. The court has carefully reviewed both of these orders, the many and various objections of all parties, and the relevant portions of the record. Based on this *de novo* review, the court concludes that the findings and legal conclusions of Magistrate Judge Vescovo are correct. Accordingly, the March 17, 1998 and July 31, 1998 orders are affirmed.

IT IS SO ORDERED.

## ORDER ON PLAINTIFF'S MOTION TO COMPEL AND NON–PARTY'S MOTION FOR PROTECTIVE ORDER

March 17, 1998

VESCOVO, United States Magistrate Judge.

Currently before the court are two discovery motions relating to documents in the possession of a non-party, Sedgwick James of Tennessee, Inc. ("Sedgwick"). The plaintiff here, Royal Surplus Lines Insurance ("Royal"), has moved for an order compelling the production of these documents and the nonparty has moved for an order protecting their nondisclosure. Both motions have been referred to the undersigned United States Magistrate Judge for determination.

### BACKGROUND

This lawsuit involves a dispute regarding the extent of coverage provided by an insurance policy issued by Royal against various risks associated with the defendant Sofamor Danek Group, Inc.'s ("SDG") products. The negotiations between the parties were facilitated by Sedgwick, SDG's insurance broker, and Tri–City Brokerage, Inc. a surplus insurance broker familiar with Royal. At the center of the dispute is whether the policy issued by Royal obligates it to provide coverage and pay the defense costs associated with certain orthopedic bone screw claims against SDG. The policy in question was issued on November 24, 1995, and shortly thereafter on February 16, 1996, Royal sent SDG a Reservation of Rights Letter ("ROR Letter").

Royal subsequently filed this declaratory judgement action on December 16, 1996, denying coverage and alleging intentional misrepresentations and/or omissions during the policy application process. Royal claims most of the information concerning the coverage sought by SDG was provided to it by Sedgwick, SDG's broker. Royal further avers this information contains numerous mis-

representations and omissions regarding the effect of several of the policy exclusions at issue. Royal seeks to discover documents generated by Sedgwick before, during and after the negotiations for the insurance policy in hopes of uncovering some evidence that Royal was fraudulently induced into writing the coverage.

On August 8, 1997, Royal issued a subpoena directed at the Custodian of the Records for Sedgwick seeking the production of documents relating to "all applications for insurance, files concerning placement of insurance, underwriting files, correspondence, records of negotiation for and binding of insurance" pertaining to SDG for the policy years 1993 to the present. It is the position of Royal that these documents are highly relevant to their claims of intentional misrepresentation, omission, mutual mistake and breach of the duty of good faith and fair dealing and therefore are discoverable.

On December 12, 1997, Royal served a Notice of Deposition informing the defendant of Royal's intention to depose Doug Pera, an employee of Sedgwick. Attached to this notice was an exhibit listing the documents and materials which Pera was instructed to bring with him to his deposition. It is not clear whether this subpoena was issued or served on Pera. In any event, to the extent that this intended subpoena seeks production of the same documents, Pera joins with Sedgwick in seeking a protective order.

Sedgwick withheld a number of documents [1] requested in the August 8, 1997 subpoena on the grounds of attorney-client privilege, joint defense privilege and the work product doctrine. Sedgwick also argues in its motion for protective order that the documents are not relevant to the allegations in this action.

## DISCUSSION

Because jurisdiction in this case is based on diversity of citizenship, state law supplies the rule of decision and the existence and limits of any privilege must be "determined in accordance with state law." Fed.R.Evid.

501. However, the applicability of the work product doctrine is governed by federal procedure, even in diversity cases. *See United Coal Companies v. Powell Construction*, 839 F.2d 958, 966 (3rd Cir.1988).

### A. Relevance

Sedgwick insists that because it is not a party to this suit, Royal must make a greater showing of relevance before discovery should be permitted. Some courts have been inclined to limit the scope of discovery directed to non-parties in order to protect the non-party from harassment, inconvenience, or disclosure of confidential documents. *See Collins & Aikman Corp. v. J.P.Stevens & Co.*, 51 F.R.D. 219, 221 (D.S.C.1971); *but see Composition Roofers Union v. Graveley Roofing Enterprises, Inc.*, 160 F.R.D. 70 (D.Pa.1995)(noting non-party treated no differently in evaluating relevancy); *see generally*, 9A Wright and Miller, *Federal Practice and Procedure*, § 2459 (concluding "there is no basis for this distinction in the rule's language").

■ Given Sedgwick's level of involvement with the negotiations and subsequent dispute between the parties as well as its claims of being protected by the joint defense privilege and of being a potential party, the court is not inclined to view Sedgwick as an innocent bystander needlessly entangled in burdensome discovery. Consequently, Royal is not required to demonstrate a heightened standard of relevance before requesting discovery from Sedgwick.

Sedgwick also argues the requested documents would not be relevant to the issues in this lawsuit. Sedgwick points out that since the dispute concerns the meaning of the policy, the "entire focus will be on the intent of the parties prior to or at the time of issuance of the policy." Therefore, Sedgwick's reasoning continues, any documents generated before the date of the policy would be inadmissible because of the parol evidence rule and any documents prepared after the date of the agreement "could have no bearing on

---

1. The original "Log of Documents Not Produced and Documents Subject to Protective Order" prepared by Sedgwick identified some 205 separate documents. After negotiations among the parties there are approximately forty documents still in dispute.

the intent of the parties" at the time of the agreement.

In general, the parol evidence rule is a rule of substantive law that provides that contracting parties may not use outside evidence to alter the plain meaning of an unambiguous written contract. *See* Cohen, Sheppard and Paine, *Tennessee Law of Evidence* § 401.7 (3rd.1995)(hereinafter "Cohen's Evidence"). However, it does not bar the admission of evidence to prove fraud, mistake, or misrepresentation. *See Stamp v. Honest Abe Log Homes, Inc.* 804 S.W.2d 455, 457 (Tenn.Ct.App.1990). Regardless, the scope of discovery is determined by Rule 26 which allows discovery into any matter relevant to the subject matter involved in the pending action. Fed.R.Civ.P. 26(b). Admissibility is not the test. *See Wright & Miller* § 2008.

Here, the plaintiffs are attempting to uncover evidence to substantiate claims of fraudulent inducement and intentional misrepresentation. Discovery directed to Sedgwick, the insured's broker who was heavily involved in the negotiations prior to and following the issuance of the policy, appears reasonably calculated to lead to the discovery of such evidence.

### B. *Attorney–Client Privilege*

Sedgwick and SDG [2] both argue that many of the documents still in dispute are protected by the attorney-client privilege. Royal contends, however, that Sedgwick is seeking to protect several types of communications to which the privilege does not apply. First, Royal claims that Sedgwick may not assert the privilege for communications between Sedgwick (directly or through its own attorney) and SDG's counsel since Sedgwick is not the client and consequently not the holder of this privilege.[3] Second, Royal argues any privilege for communications between Sedgwick and its attorneys would be waived by sending copies to SDG and conversely, any communications between SDG's counsel and SDG's employees would be waived if these communications were in the hands of Sedgwick, a third party.

As noted, the applicability of any testimonial privilege is determined by reference to state law. The attorney-client privilege in Tennessee has been codified as follows:

No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person, during the pendency of the suit, before or afterwards, to the person's injury.

Tenn.Code Ann. § 23–3–105 (1994). This statute is an embodiment of the common law principles of the privilege. *See* 21 Tenn. Juris. Privileged Communications § 3. The Tennessee Supreme Court has held the privilege "excludes all communications, and all facts that come to the attorney in the confidence of the relationship." *Johnson v. Patterson*, 81 Tenn. 626, 649 (1884). However, the privilege is not absolute. The requirements for the privilege to apply are:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the

---

**2.** Sofamor Danek Group, Inc.'s Memorandum Opposing Royal Surplus Lines Insurance Company's Motion to Compel Non–Party Sedgwick James of Tennessee, Inc. to Produce Certain Documents filed January 20, 1998, claimed "to the extent Sedgwick has asserted SDG's rights in its capacity as SDG's agent, SDG has standing to oppose Royal's motion to compel." (Mem. at 2).

**3.** Because SDG has subsequently filed a memorandum in opposition to Royal's motion to compel asserting its attorney-client privilege with respect to the communications, this argument is now moot.

privilege has been (a) claimed and (b) not waived by the client.

*Humphreys, Hutcheson & Moseley v. Donovan*, 568 F.Supp. 161, 175 (M.D.Tenn.1983)(construing the Tennessee statute).

### A. *Confidentiality and the Presence of Third Persons*

In this case, the disputed communications involved a variety of people: in-house counsel and employees of Sedgwick and in-house counsel and employees of SDG as well as outside counsel for SDG. Generally, Royal argues that the inclusion of parties who are strangers to the various attorney-client relationships destroys any privilege and evidences a lack of intent by the parties that the communications remain confidential. Sedgwick and SDG, however, contend Sedgwick was not a stranger to the attorney-client relationship. Instead, they argue that Sedgwick is more properly seen as a agent or representative of SDG and should be considered an "insider" for purposes of the privilege.

The degree to which the presence of third parties destroys the privilege is not a subject which has received much attention from the state courts in Tennessee. One supreme court case has held that the presence of a professional negotiator at a meeting between a local school board and its attorney did not destroy the privilege. The court stated:

> The attorney-client evidentiary privilege only extends to communications from the client to the attorney. D. Paine, Tennessee Law of Evidence, § 96, p. 111–112 (1974), and confidentiality is destroyed when those communications take place in the presence of a third party. *Hazlett v. Bryant*, 192 Tenn. 251, 257, 241 S.W.2d 121, 123 (1951). The privilege is designed to protect the client and because it belongs to the client, may be waived by him. When the third party in whose presence such communications take place is an agent of the client, the confidentiality is not destroyed. McCormick § 91 (2d ed.1972); D. Paine, Tennessee Law of Evidence, § 97, p. 112 (1974).

*Smith County Education Association v. Anderson*, 676 S.W.2d 328, 333 (Tenn.1984). Although the *Smith* court clearly indicated a willingness to extend the privilege in order to cover agents of the client, the Tennessee courts have not further illuminated the type of agency relationship needed to justify application of the privilege. In the absence of any clear authority on point, it is the role of the federal court in diversity cases to consider all of the available legal sources in order to formulate a rule of decision. *See Anderson Development Company v. Travelers Indemnity Company*, 49 F.3d 1128, 1131 (6th Cir.1995). The authorities cited by the *Smith* court provide little insight into the requirements of the third party relationship, however, there is a growing body of federal law on the subject.

The issue received its most extensive treatment in *In re Bieter*, 16 F.3d 929 (8th Cir. 1994). In that case the petitioner, a partnership, sought mandamus to direct the district court to vacate an order compelling discovery of information it claimed to be protected by the attorney-client privilege. *Id.* The partnership argued the privilege should extend to include an independent consultant who had been extensively involved with the underlying transaction that was the subject matter of the suit. The consultant had also been significantly involved in subsequent communications between the partnership and its attorney. The consultant had met with the partnership's attorney, both alone and with a partner, and he had received many communications from the attorney, some sent to him directly and some on which he was merely copied.

The magistrate judge ruled that the partnership had waived its privilege by disclosing these materials to the consultant. The magistrate found that the consultant was neither an employee of the partnership nor a client of the attorney and any disclosure to him destroyed whatever privilege may have otherwise applied. The Eighth Circuit granted the petition for mandamus holding under these circumstances there was no principled reason to distinguish between the consultant and an employee.

The *Bieter* court based its holding on two controlling principles which this court finds very persuasive. First, the court recognized that a rigid approach to analyzing the parameters of the attorney client relationship did not accurately reflect the realties and complexities of corporate activities. The *Bieter* court cited *Upjohn v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) in support of this principle. *Bieter,* 16 F.3d at 938. In that case the Supreme Court had rejected the "control group" test then used by some lower courts to determine the parameters of the corporate attorney-client privilege. *Upjohn,* 449 U.S. at 393, 101 S.Ct. 677. The *Upjohn* Court viewed this type of formalistic approach as too restrictive "in light of the vast and complicated array of regulatory legislation confronting modern corporations." *Id.* at 392, 101 S.Ct. 677. The court instead opted for a case by case determination based on whether the employee was communicating with counsel at the direction of superiors in order to secure legal advice. *Id.* at 394, 101 S.Ct. 677.

Second, the *Bieter* court recognized that sound legal advice and advocacy serves important public interest and depends on the free flow of information to the attorney. *Bieter,* 16 F.3d at 937–38. The court also noted "there undoubtedly are situations ... in which too narrow a definition of "representative of the client" will lead to attorneys not being able to confer confidentially with non-employees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely. *Id.*

With these theoretical considerations in mind, the *Bieter* court examined the relationship between the consultant and the partnership. Because the consultant had been so intimately involved with the members of the partnership as well as with the underlying transaction which formed the basis for the lawsuit, the court reasoned that he likely possessed information possessed by no other and this made him precisely the sort of person with whom a lawyer would wish to confer

confidentially in order to fully advise his client. *Id.*

### i. *The Nature of the Relationship Between Sedgwick and SDG*

The first task is to define the relationship between Sedgwick and SDG. Then, based on the principles outlined by the *Bieter* court, the court must determine if the relationship is worthy of the protections of the privilege.

■ The analysis of the relationship which exists between Sedgwick and SDG is complicated somewhat by a Tennessee statute that declares:

> Every insurance agent or limited insurance representative who solicits or negotiates an application for insurance of any kind shall, in any controversy arising from the application for insurance or any policy issued in connection therewith between the insured or insured's beneficiary and the insurer, be regarded as the agent of the insurer and not the insured or insured's beneficiary.

Tenn.Code Ann. § 56–6–147 (1994). Royal argues that the mere presence of this statute forecloses any expectation by SDG that Sedgwick might be considered clothed with the protections of the privilege.[4] Royal is correct in pointing out that no Tennessee case has construed the statute in a context similar to the one presented here. Indeed, research by the court reveals that this statute was intended to protect consumers by binding insurance companies to the representations of local, sometimes unethical, solicitors. *See Industrial Life & Health Insurance v. Trinkle,* 30 Tenn.App. 243, 204 S.W.2d 827 (1947)(decision under prior statute). Furthermore, the overlap in nomenclature between insurance law and privilege law should not be allowed to cloud the inquiry. The term "agent" is used in a myriad of different contexts. What the *Smith* court meant by "agent" in the context of privilege law is clearly quite different from what the statute is attempting to classify for the purposes of insurance law. *See e.g. Glisson v.*

---

4. Royal, obviously, stops short of urging the court to adopt the full import of the statute. Royal also mischaracterizes the statute as defining "an insurance agent *or broker* as the agent of

the insurance company." (emphasis added)(Resp. of Royal Surplus Lines Insurance Co. to Mot. of Non–Party Sedgwick James of Tennessee, Inc. for Protective Order at 6.)

*Stone,* 4 Tenn.App. 71 (1926)(stating in the course of determining whether the defendant was an insurance broker or agent, "the law cares little about names. The questions is, what was the relation of the parties.") *Id.* at 74; *see also Upjohn,* 449 U.S. at 392, 101 S.Ct. 677 (eschewing labels when analyzing attorney client privilege in corporate communications).

Both Sedgwick and SDG characterize Sedgwick as SDG's "broker or representative." *Couch on Insurance 3rd.* § 45:4 (1996) describes a broker as a "middleman between the insured and the insurer" "employed in each instance as a special agent for a single purpose" usually "involved in what can be viewed as a series of discrete transactions." *Id.* Couch goes on to list several factors to consider when determining whether a person acts as a broker or agent, (1) who first set the agent in motion; (2) who controlled agent's actions; (3) who paid agent; and (4) whose interest agent was attempting to protect. *Id.* Aside from the lack of evidence regarding who paid Sedgwick once the coverage was written, it is clear that the remaining factors weigh heavily in favor of viewing Sedgwick as SDG's broker for the purposes of this transaction. *See generally Couch on Insurance 3rd,* Chapter 45 (1996). Because the court finds that Sedgwick was SDG's insurance broker, rather than either party's insurance agent, the Tennessee statute is not applicable to the instant case.

Royal next argues that since Sedgwick was not hired at the direction of SDG's attorneys, it cannot be viewed as an extension of SDG's attorneys and therefore, the privilege should not apply. However, the *Smith* court and the authorities cited therein do not require that the representative be hired at the direction of the attorney in order to fall within the privilege. *See Smith,* 676 S.W.2d at 333; McCormick 3rd § 91; Cohen on Evidence § 501.4.

■ Turning to the instant case, the court believes the relationship which existed between Sedgwick and SDG, as well as Sedgwick's involvement in the underlying transaction, justifies extending privilege. In support of the motion for protective order Sedgwick submitted the Affidavit of Douglas W. Pera ("Pera Aff."), senior vice-president of Sedgwick and account manager in charge of brokering coverage for SDG. According to Pera, he was the main conduit of information between Royal and SDG during the negotiations for the policy. Royal's Memorandum in Support of the Motion to Compel confirms, "Sofamor Danek supplied information concerning the risks involved and coverage sought to Sedgwick, who would then supply that information to Tri–City and the information was then submitted to Royal." (Royal Mem. in Support of Mot. to Compel at 3.) Royal even goes so far as to refer to Sedgwick as SDG's "insurance agent." *Id.* According to SDG's Memorandum, SDG had no employees knowledgeable about complex commercial insurance. Furthermore, SDG knew that substantial on-going exposure from personal injury suits related to the manufacture of orthopedic bone screws would make obtaining coverage a "complex and difficult undertaking raising many possible legal issues and would require a great deal of care to avoid future insurance problems." (SDG Memo. at 4.)

Although the policy in question was issued on November 24, 1995, this did not end Pera's involvement with SDG. Rather things were just getting started. Almost immediately, Royal began to question its obligation to cover costs of additional bone screw claims presented by SDG. At this point, Pera claims he met with Sedgwick's assistant general counsel, Darryl Martin to discuss the controversies. Apparently, it was agreed that since Sedgwick and SDG shared a common interest in the dispute, Pera would continue to work with SDG and its attorneys to defeat attempts by Royal to avoid its obligations. To this end, Pera participated in meetings and strategy sessions with SDG and SDG's counsel.

Given the level of complexity involved in the transaction, and the extent to which Sedgwick, through Pera, was involved in the negotiations on behalf of SDG, the court concludes he should be deemed an "insider" with respect to communications he shared in both before and after the issuance of the policy.

As a final point, the court notes that SDG did not merely utilize the services of Pera individually, but also the resources of Sedgwick in general. Therefore, Sedgwick's in-house counsel Daryll Martin and Carol Son, administrative assistant to Pera, could reasonably be expected to contribute their help and expertise to the brokerage services provided by Sedgwick. However, the court is not inclined to extend the attorney client privilege [5] any further to cover more remote Sedgwick employees without a more detailed showing of the necessity of their involvement.

## B. *Joint Defense Privilege*

■ Sedgwick and SDG also argue for the protection of the joint defense privilege. This extension of the attorney client privilege provides protection to confidential communications shared among persons with a common or similar interest in order to set up a common defense strategy. Royal argues the privilege should not be available because Sedgwick is not a party to this lawsuit and because some of the documents sought to be protected were generated before the action was filed in December 1996.

■ Like the attorney client privilege, the scope of the joint defense privilege must be determined by reference to state law. Fed. R.Evid. 501. Unfortunately, here again, there is a paucity of authority from the Tennessee courts in this area. Only one reported decision has recognized the existence of the joint defense privilege, however, it was held inapplicable to the facts of that case. *Vance v. State*, 190 Tenn. 521, 230 S.W.2d 987 (1950).

The defendant in *Vance* appealed the trial court's admission of a confession made in the presence of his co-conspirator's attorney. The co-conspirator, the co-conspirator's attorney, Vance and his attorneys had held a conference at the offices of Vance's attorneys in order to discuss the case. The court in *Vance* ruled that the privilege was inapplicable to these facts because the proof showed that the purpose of the conference was to simply interview the co-conspirator about his

intended trial testimony and to plan a defense strategy only for Vance. *Id.* at 990. Although the two were codefendants, the court held there was no community of interest or preparation of a joint strategy for trial which had been furthered by confidential communications between the two and their attorneys. *Id.* at 991. Therefore, the privilege was unavailable.

Clearly, the *Vance* court focused more on the realities of the parties' particular situation than on the mere fact that they were codefendants in a criminal case. This approach has been followed by the federal courts. Instead of determining the privilege based on the formal alignment of the parties, courts examine the actual or potential relationship of the parties. *See Continental Oil Co. v. United States*, 330 F.2d 347 (9th Cir. 1964).

■ In this case, Royal has pleaded fraudulent inducement, misrepresentation and intentional omissions during the application process. However, Royal has also stated that the majority of the information which it received regarding the coverage sought by SDG came through Sedgwick, SDG's insurance broker. It is patently obvious then that given the structure of the negotiation process and the nature of Royal's complaints, Sedgwick and SDG shared a common interest in any potential litigation with Royal.

■ The weight of authority also favors considering the actual or potential identity of interest which the parties share rather than limiting the privilege to communications occurring only after litigation commences. *See SCM Corp. v. Xerox Corporation*, 70 F.R.D. 508, 513 (D.Conn.1976). The privilege protects the free flow of information for the purpose of receiving legal advice, either in contemplation of litigation, or in attempting to avoid it. However, the common defense must at least be foreseeable. *See Medcom Holding Co. v. Baxter Travenol Lab.*, 689 F.Supp. 841 (N.D.Ill.1988)(noting "the privilege arises out of a need for a common defense, as opposed merely to a common

---

**5.** This is not to say that some other privilege may not apply to communications involving these oth-

er employees of Sedgwick.

problem.") *Id.* at 845. As a result, one relying on the joint defense privilege must establish that (a) there was existing litigation or a strong possibility of future litigation; and (b) the materials were provided for the purpose of mounting a common defense against it. *Id.*

In this case, Sedgwick, through the affidavit of Doug Pera, claims Royal began questioning its obligation under the policy shortly after the coverage was bound on November 24, 1995. Royal's complaints continued through December 1995 and January 1996, and on February 16, 1996, Royal notified SDG that it was reserving certain rights under the Policy. The court feels the point at which Royal sent the formal reservation of rights letter most clearly indicates the strong possibility of future litigation and triggers the availability of the joint defense privilege for communications shared between the parties and their counsel.

## C. *Work Product Doctrine*

As a final point, Sedgwick and SDG argue for the protection of the work product doctrine. Royal contends, however, that this protection should not be available to shield materials in the possession of Sedgwick, a non-party. Also, Royal claims many of the materials were not prepared in anticipation of this litigation, but rather in the ordinary course of business. Finally, Royal argues it has a substantial need for the documents and is unable to obtain equivalent information by other means.

█ The party seeking the protection of the work-product privilege has the burden of proving that the disputed documents are work product. The work product doctrine, announced in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and codified in Fed.R.Civ.P. 26(b)(3), protects documents and other tangible things prepared in anticipation of litigation by or for a party, or by or for a party's representative. The work product doctrine protects the integrity of the adversarial process by creating a zone of privacy and protection for the attorney's preparatory work on a case. *See Hickman,* 329 U.S. at 510–11, 67 S.Ct. 385. The Sixth Circuit has set out a sequential

analysis the court must go through when a claim of work product protection is made. *See Toledo Edison Company v. G A Technologies, Inc.,* 847 F.2d 335, 339–40 (6th Cir. 1988). First, the party requesting the materials must make an initial showing that the information contained therein is relevant to the subject matter of the pending litigation and not otherwise privileged. Next, the party opposing production must demonstrate that the materials were prepared in anticipation of litigation by or for that party's attorney or representative. Then, the burden shifts back to the requesting party to establish a substantial need of the materials and the inability to obtain the substantial equivalent of the materials by other means without undue hardship. In no event, however, should the court require the production of mental impressions, conclusions, opinions or legal theories of an attorney or other representative concerning the litigation. *Id.*

█ The work product protection only applies to materials which are "otherwise discoverable." Fed.R.Civ.P. 26(b)(3). Therefore, if the court determines that any of the documents are privileged, then discovering party has failed the first step and the court will not proceed through the remaining steps.

█ The plain language of the rule also makes clear that materials prepared by the other party's representative are subject to protection. The rule places emphasis on the motivations behind the preparation rather than the on the person who prepared it. Here, Sedgwick has steadfastly maintained that it was SDG's broker/representative during the negotiations and subsequent coverage dispute. Therefore, documents prepared by Sedgwick at the direction of SDG's counsel or for the benefit of SDG's counsel qualify as potential work product.

The final inquiry of the second step requires the materials be prepared in anticipation of litigation. Although Pera's affidavit states Royal began objecting to claims shortly after the policy was issued, the court feels that once the ROR Letter was sent on February 16, 1996, it became reasonable to anticipate litigation. *See* 8 Wright, Miller & Mar-

cus, *Federal Practice and Procedure: Civil 2d § 2024.*

■ Finally, Royal argues that even if some of the materials are protected work product they should still be produced since "Sedgwick and its employees are perhaps the only witnesses with knowledge of the application process." This argument is unpersuasive. Whatever knowledge employees of Sedgwick possess about the application process would not be protected by work product. Work product protects materials not information. Royal is free depose employees of Sedgwick to inquire into these areas.

## THE DISPUTED DOCUMENTS

■ Sedgwick, Royal and SDG have all provided the court with a list of the disputed documents identified by "Bates Stamp" number. The information detailing the author, recipient(s), date and subject of each document has been taken from the description provided by Sedgwick, who is in possession of the documents. To the extent it is possible given the paucity of some of the information, the court will rule on whether each document is discoverable. Fed.R.Civ.P. 45(d)(2) instructs that when information subject to a subpoena is withheld on a claim of privilege or as protected trial preparation materials, then the claim must be "made expressly and shall be supported by a description of the nature of the documents... sufficient to enable the demanding party to contest the claim." Fed.R.Civ.P. 45(d)(2). The burden is on whoever asserts the privilege.

1. *S00804*—Handwritten notes prepared by Pera on August 16, 1996, detailing discussions he had with SDG's outside counsel regarding the Policy. Because this court has deemed Pera an insider for purposes of the attorney-client privilege, this document is not discoverable.

2. *S01086–99*—Drafts of an August 26, 1996 letter from Pera to Ken Fitzpatrick, an employee of Tri–City, the company that helped broker the deal between Royal and SDG. These drafts were apparently circulated among Pera, Sedgwick's general counsel, Daryll Martin and SDG's outside counsel. The final version of the letter has been produced, however, the drafts were withheld because they contain the handwritten comments of both attorneys. Communications from Pera to Martin, Sedgwick's own attorney, are clearly privileged. Communications from Pera to SDG's outside counsel are also privileged because Pera is an insider at SDG for purposes of this transaction. Also, because of the joint defense privilege, the Pera–SDG privilege would not be waived by including Martin and the Pera–Martin privilege would not be waived by including SDG.

3. *S01257–66*—A cover memo and draft agreement prepared on January 29, 1996 by SDG's outside counsel and directed to the Vice–President/General Counsel and the Treasurer of SDG involving proposals to address disputes with several carriers regarding bone screw claims. Royal contends that because this document was also sent to Pera, the attorney client privilege has been waived. However, as previously noted, certain employees of Sedgwick, including Pera, are viewed as insiders for purposes of the attorney client privilege. Because the memo was prepared before the reservation of rights letter, the joint defense privilege is not available.

4. *S01338–487*—Described as 149 pages of handwritten notes by Pera covering various dates detailing conversations with Sedgwick's counsel, SDG's in house and outside attorneys, and SDG. In Sedgwick's memorandum of law, Sedgwick claims that approximately 40 pages of these notes predate the policy and are covered by the attorney client privilege since Pera was an "insider". The court agrees. A determination as to whether any of the rest of notes are discoverable is hampered by a lack of specific information. As previously discussed, the joint defense privilege and the work product protection are limited to documents prepared after the reservation of rights letter and all of the privileges are restricted dependent upon who shared in the communications. Sedgwick and SDG have failed to carry its burden with respect to the remaining notes.

5. *S03575–76*—Internal SDG memorandum from the Assistant Treasurer of SDG to an executive with the SDG with a copy to

SDG's general counsel prepared on February 22, 1995. Simply sending a carbon copy to in house counsel does not cloak a routine business communication with attorney client privilege. The communication must have been for the purpose of securing legal advice. Moreover, the timing of the document places it outside the scope of protection provided by either the joint defense privilege or the work product protection.

6. *S06743–44*—Memorandum prepared by Pera on April 30, 1996, detailing a meeting with SDG outside counsel and SDG Treasurer concerning policy coverage. SDG has advised the court that this document does not "directly implicate SDG's rights and, thus, SDG takes no position." (SDG's Mem. Opp. Royal's Mot. to Compel. at 22.) Therefore, this document is discoverable since SDG'S attorney client privilege and work product protection have not been claimed and since Sedgwick's attorney client privilege could not possibly be implicated in a communications between Pera and SDG's outside counsel.

7. *S06751–52*—Memo prepared by Pera memorializing discussions he had with Sedgwick in-house counsel Daryll Martin sometime in September 1996. Although not expressly stated, it is presumed the discussions were for the purpose of obtaining legal advice. Therefore, the document is protected by the attorney client privilege between Sedgwick employees and Sedgwick attorneys.

8. *S06997*—Letter from Pera to an officer of SDG with copies to SDG General Counsel and SDG outside counsel, prepared May 13, 1996, discussing the dispute with Royal. As previously stated, simply sending a copy of a document to an attorney will not automatically cloak the communication with the protection of the attorney client privilege. The party asserting the privilege must explain how including the attorney in communication was also for the purpose of securing legal advice, or provide some specific context for the communication. Here, Sedgwick has asserted the document was generated in the context of this litigation and the court finds it is within the attorney client privilege. Also, the document was prepared after the ROR

Letter and in anticipation of litigation by a representative (Sedgwick) of a party to the lawsuit (SDG) and is protected work product.

9. *S07037–38*—Memo prepared May 3, 1996, from Pera to his Administrative Assistant, Carol Son, reflecting procedures employed between Sedgwick and SDG's outside counsel relating to "claims." No further explanation is given as to the "claims." The court interprets the procedures which are the subject matter of the memo to relate to third party product liability claims against SDG and not this litigation. Therefore, no privilege or work product applies.

10. *S07057–63* was inadvertently withheld. Sedgwick has agreed to produce, and the issue is moot.

11. *S07094*—This document was described by Sedgwick in its privilege log as a memo to Pera from his Administrative Assistant regarding "claims." In its memorandum, Sedgwick says the contents relate to possible disputed issues with Royal dated April 3, 1996 and prepared on the behalf of SDG in anticipation of litigation. Because of the inconsistencies in Sedgwick's description, the court cannot determine that the contents are privileged.

12. *S07127*—E-mail from Pera to Sedgwick's in-house counsel seeking legal opinion with no indication of receipt by third party. Attorney client privilege of Sedgwick protects it from discovery.

13. *S07308*—Memo from Carol Son to Sedgwick in-house counsel regarding Sofamor/Surgical Navigation Technologies. Although not expressly stated, it is presumed Son was seeking legal advice. There is no indication of receipt by third party. It is protected by Sedgwick attorney client privilege.

14. *S07469–70*—Hand written memo from Sedgwick counsel to Pera with post-it note memo from Pera to Son attached. Sedgwick's attorney client privilege applies.

15. *S07570* is being produced, and motion is moot.

16. *S07581–92*—Memo regarding *English v. Mentor*. No argument was presented regarding any privilege for this document.

Therefore, objections are deemed abandoned and any privilege deemed waived.

17. *S07593–7697*—Sedgwick initially withheld S07604–97, but now acknowledges that these pages should have been produced and has agreed to do so. The remaining pages are a memo from a Sedgwick vice president in California containing handwritten notes of Pera to SDG's General Counsel prepared on November 9, 1995, discussing the organization of "claims" and the negotiations for coverage with SDG carriers from prior years. This document was prepared before the policy was issued and therefore cannot be covered by the joint defense privilege or work product doctrine. The court has previously held that Pera's actions as a broker for SDG make him an insider for the purposes of SDG's attorney client privilege and any notes he made which were directed to SDG's General Counsel should be redacted. However, the "insider" designation does not extend to all Sedgwick employees and there has been no showing that this communication was anything other than a routine business communication. Again, the court does not know what "claims" are discussed. If it relates to the bone screw litigation, it can be produced under a confidentiality agreement.

18. *S07698–7700*—Memo from a SDG outside counsel, James Beck, to SDG General Counsel prepared October 2, 1995, regarding the impact of a recent decision, *English v. Mentor Corp.* on bone screw litigation. As noted, SDG's attorney client privilege was not waived by including Pera in communications which relate to efforts to secure and maintain insurance coverage or the present lawsuit. The date of this document seems to indicate that it was routed to Pera in conjunction with his efforts to secure coverage for SDG. In any event, SDG also argues that this document is work product from other litigation and should be protected here as well. The Sixth Circuit has recognized that work product protection extends to other litigation. *See United States v. Leggett & Platt, Inc.,* 542 F.2d 655, 660 (6th Cir.1976). Also, the fact that the work product was disclosed to Pera does not waive the privilege so long as the disclosure was consistent with the adversarial system. *See United States v.*

*American Telephone and Telegraph,* 642 F.2d 1285, 1299 (D.C.Cir.1980)(noting the difference in the concept of waiver in the context of attorney client privilege as opposed to work product).

19. *S08902–06*—Memo from SDG outside counsel, S. Phillips, to SDG General Counsel and Pera prepared June 21, 1995, regarding bone screw litigation and containing handwritten notes. Here again, Pera is included in SDG's confidential attorney client communications, however, in this instance the date of the communication indicates it was prepared several months before Pera was dispatched to locate a new carrier. The court does not view Pera as a permanent insider at SDG, rather he is deemed an insider for purposes of this transaction only. Therefore, the privilege is deemed waived by including a third party in the communication months before the third party's involvement became necessary to the transaction. If, on the other hand, the communication is dated in June 1995, but not given to Pera until September or October 1995, then the court might be inclined to allow the privilege. However, this is merely speculation and based on the description provided by Sedgwick the document is not privileged.

Nevertheless, the document is work product from the pedicle screw litigation and consistent with the analysis set out in # 18 above, it will be protected here as well.

20. *S09147–48*—Letter from SDG General Counsel to SDG employee in claims department in Europe on October 19, 1994, with copies to SDG outside counsel and Pera. Here again, the court is not inclined to view Pera as a permanent insider at SDG. Therefore, the privilege is deemed waived by including a third party (Pera) in the communication months before the third party's involvement became necessary to the transaction.

21. *S09634–80*—These pages are listed on the log and described as "various e-mail messages regarding conversations with Daryll Martin, in house counsel." There is no indication of the subject matter of the conversations, whether legal advice was sought or given, or whether circulation of these e-mails

were limited to those persons with a need to know.

22. *S09693–97*—Memo from Pera to Sedgwick attorney prepared August 29, 1996, and enclosing memo and notes from SDG attorney. This is protected by SDG's attorney client privilege since both Pera and counsel for Sedgwick are insiders and by the joint defense privilege since it was prepared after the ROR letter.

23. *S09705*—Memo from Pera to Carol Son prepared September 30, 1996, "regarding comments of attorney." The communication was after the ROR letter, however, there is no indication as to whose attorney made the comments. However, because the memo was prepared by a representative (Sedgwick) of a party (SDG) in anticipation of litigation regarding coverage under the policy, it is protected work product. Royal has not shown any substantial need or undue hardship.

24. *S09766–67*—Memo from Pera to Son with questions to attorney dated May 13, 1996. Here again, the attorney is not identified, but the document, prepared by a party representative in anticipation of litigation, is protected work product.

25. *S09777–78*—Undated letter from outside counsel of SDG to Pera regarding response to Royal. Because there is no indication of the timing of this communication, it is impossible to determine if it is work product. The only other protection claimed is Sedgwick's attorney client privilege, however Pera is considered an insider for SDG's privilege only. Pera or Sedgwick does not have an independent attorney client relationship with SDG's outside counsel. Communications between Pera and SDG's attorneys are protected by SDG's privilege and this has not been claimed.

26. *S09779*—Memo to Pera from his assistant referencing conversation with attorney prepared March 19, 1996. No attorneys are identified, but the memo is protected as work product. (See # 23 above.)

27. *S09870*—Same description and analysis as # 26 above.

28. *S09896*—Undated memo from executive of SDG to Pera referencing conversation with attorneys. It is impossible to determine the applicability of any privilege without knowing the timing or the specific context of the communication. Sedgwick and SDG have failed to carry the burden.

29. *S09901*—E-mail from Pera to another Sedgwick employee with a copy sent to Sedgwick in-house counsel prepared June 9, 1996. As previously noted, simply copying corporate counsel on communications will not automatically cloak the document with privilege. There must be some explanation as to how the communication was for the purpose of securing legal advice.

30. *S09908*—Undated memo from SDG outside counsel to Pera. Because there is no indication of the timing of this communication, it is impossible to determine if it is work product. Likewise, the joint defense privilege and extension of SDG's attorney client privilege to Pera are also dependent on timing of the communication or the specific context in which it was made. Sedgwick and SDG have failed to carry the burden of demonstrating the applicability of any privilege or protection for this document.

31. *S09915*—Pera E-mail to Sedgwick counsel prepared February 8, 1996. Even though there is no indication that the communication was for the purpose of obtaining legal advice, it is presumed that was the purpose.

32. *S09916*—E-mail from Pera to another Sedgwick employee with a copy sent to Sedgwick in-house counsel prepared February 16, 1996. As previously noted, simply copying corporate counsel on communications will not automatically cloak the document with privilege. There must be some explanation as to how the communication was for the purpose of securing legal advice.

33. *S09923*—E-mail from Pera to another Sedgwick employee with a copy sent to Sedgwick in-house counsel prepared January 16, 1996. As previously noted, simply copying corporate counsel on communications will not automatically cloak the document with privilege. There must be some explanation as to how the communication was for the purpose of securing legal advice.

34. *S09928*—Pera E-mail to Sedgwick counsel prepared October 16, 1996. There is no indication that Sedgwick's attorney client privilege has been waived with respect to this document. Again, it is presumed the purpose of the communication was to seek legal advice.

35. *S09930*—Pera E-mail to Sedgwick counsel prepared July 16, 1996. There is no indication that Sedgwick's attorney client privilege has been waived with respect to this document. Again, the purpose is presumed to be for legal advice.

36. *S09935–39*—Memo from Pera to Sedgwick attorney prepared August 29, 1996, enclosing memo and notes from SDG attorney. This would be protected by Sedgwick's attorney client privilege and the joint defense privilege since it was prepared after the ROR letter.

37. *S09985*—E-mail from Pera to his assistant, Carol Son and another account executive with Sedgwick prepared December 15, 1996. Sedgwick claims attorney client privilege, however, the communication is between non-lawyers and Sedgwick has not carried the burden of demonstrating how this communication was for the purpose of securing legal advice.

38. *S09986*—Pera E-mail to an unidentified person named "Mike Pera" prepared December 16, 1996. Sedgwick claims attorney client privilege, however, the communication is between non-lawyers and Sedgwick has not carried the burden of demonstrating how this communication was for the purpose of securing legal advice.

39. *S09987*—Pera E-mail to an unidentified person named "Mike Pera" prepared December 16, 1996. Sedgwick claims attorney client privilege, however, the communication is between non-lawyers and Sedgwick has not carried the burden of demonstrating how this communication was for the purpose of securing legal advice.

40. *S09988*—E-mail from Pera to another Sedgwick employee with a copy sent to Sedgwick in-house counsel prepared May 24, 1996. As previously noted, simply copying corporate counsel on communications will not automatically cloak the document with privilege. There must be some explanation as to how the communication was for the purpose of securing legal advice.

## CONCLUSION

Both the Motion to Compel and the Motion for Protective Order are granted in part and denied in part as summarized below.

## SUMMARY

| DOCUMENT NUMBER | | RULING | PRIVILEGE |
|---|---|---|---|
| 1. | S00804 | Not Discoverable | AC |
| 2. | S01086–99 | Not Discoverable | AC, JD |
| 3. | S01257–66 | Not Discoverable | AC |
| 4. | S01338–487 | Partially Discoverable | AC |
| 5. | S03575–76 | Discoverable | |
| 6. | S06743–44 | Discoverable | |
| 7. | S06751–52 | Not Discoverable | AC |
| 8. | S06997 | Not Discoverable | AC, WP |
| 9. | S07037–38 | Discoverable | |
| 10. | S07057–63 | Inadvertently withheld | |
| 11. | S07094 | Discoverable | |
| 12. | S07127 | Not Discoverable | AC |
| 13. | S07308 | Not Discoverable | AC |
| 14. | S07469–70 | Not Discoverable | AC |

| DOCUMENT NUMBER | RULING | PRIVILEGE |
|---|---|---|
| 15. S07570 | Is being produced | |
| 16. S07581–92 | Discoverable | |
| 17. S07593–7697 | Partially Discoverable | AC |
| 18. S07698–7700 | Not Discoverable | AC, WP |
| 19. S08902–06 | Not Discoverable | WP |
| 20. S09147–48 | Discoverable | |
| 21. S09634–80 | Discoverable | |
| 22. S09693–97 | Not Discoverable | AC, JD |
| 23. S09705 | Not Discoverable | WP |
| 24. S09766–67 | Not Discoverable | WP |
| 25. S09777–78 | Discoverable | |
| 26. S09779 | Not Discoverable | WP |
| 27. S09870 | Not Discoverable | WP |
| 28. S09896 | Discoverable | |
| 29. S09901 | Discoverable | |
| 30. S09908 | Discoverable | |
| 31. S09915 | Not Discoverable | AC |
| 32. S09916 | Discoverable | |
| 33. S09923 | Discoverable | |
| 34. S09928 | Not Discoverable | AC |
| 35. S09930 | Not Discoverable | AC |
| 36. S09935–39 | Not Discoverable | AC, JD |
| 37. S09985 | Discoverable | |
| 38. S09986 | Discoverable | |
| 39. S09987 | Discoverable | |
| 40. S09988 | Discoverable | |

IT IS SO ORDERED.

## ORDER ON MOTIONS TO RECONSIDER

### July 31, 1998

The procedural history of this discovery dispute is quite entangled. Originally, the plaintiff Royal Surplus Lines Insurance Company ("Royal") attempted to subpoena documents from a non-party, Sedgwick James of Tennessee ("Sedgwick"). Sedgwick withheld approximately forty documents requested in the subpoena on the grounds of attorney-client privilege, joint defense privilege, and work product doctrine. Royal then filed a motion to compel production of the documents and Sedgwick filed a motion for a protective order to prevent their disclosure. Both of the these motions were referred to the undersigned United States Magistrate Judge for determination. On March 17, 1998, this court issued an Order on Plaintiff's Motion to Compel and Non-party's Motion for Protective Order ("March Order") which, for the most part, found the documents were

protected by the claimed privileges. However-er, the court limited the scope of the privileges and also found that Sedgwick had failed to carry its burden of demonstrating that some of the documents were entitled to protection.

Thereafter, Royal, the defendant Sofamor Danek Group ("SDG") and Sedgwick all lodged various objections, appeals and motions to reconsider in an attempt to persuade either the district court or magistrate to reconsider, modify or set aside the March Order.

Sedgwick filed a Motion to Reconsider Discovery Order and to Consider Additional Disputed Documents in Light of Supplemental Record, on March 27, 1998.[1] The "supplemental record" was the Second Affidavit of Douglas W. Pera, a Sedgwick employee, which contained more detailed information about documents which this court's March Order had found were discoverable based on Sedgwick's failure to carry its burden of showing they were privileged.[2] Sedgwick also filed a contemporaneous notice of appeal and objections to the March Order directed to the district court pursuant to Fed.R.Civ.P. 72(a) which incorporated by reference the arguments contained in the motion to reconsider and the information in the supplemental record.[3]

Royal filed its own objections and motion for review of the March Order directed to the district court[4] as well as a response to Sedgwick's motion to reconsider which incorporated the arguments made in Royal's objections. One of those arguments was the crime-fraud exception to the attorney-client privilege. Royal claimed that any documents which reflect legal advice sought or given with respect to the commission of a present or future fraud were not entitled to the protection of the attorney-client privilege. Although this legal argument was not presented during the initial determination, the court agreed to consider the application of this exception to the findings in the March Order in light of affidavits filed by Royal in support of its motion for summary judgment detailing the negotiation process that proceeded the insurance contract.

Royal also filed a motion to strike the supplemental record submitted by Sedgwick based on the fact that the standard of review that governs objections to magistrate's rulings precludes consideration of any additional factual information that was not before the magistrate. Apparently, Royal either assumed that once Sedgwick filed an appeal to the district court the discovery matter would no longer be before the magistrate, or failed to realize that the supplemental record was also a part of the motion to reconsider. In any event, Royal limited its arguments with respect to the supplemental record to a discussion of the propriety of considering the information rather than addressing how this information might alter the court's prior conclusions. Since SDG's and Sedgwick's motions to reconsider were referred to this court for determination and it is within the court's discretion to entertain additional proof or legal arguments in deciding the reconsideration, the court denied Royal's motion to strike the supplemental record with respect to the documents that were the sub-

1. The motion to reconsider and supplemental record also argued for the protection of a second group of documents that Sedgwick had subsequently located and claimed as privileged. The court granted Royal's motion to strike the supplemental record with respect to these additional documents finding that they were not ripe for adjudication.

2. Sedgwick mischaracterizes its failure to carry its burden initially as "the Magistrate did not feel the original descriptions were sufficiently detailed to allow her to rule properly." (See Doc. # 119 at 3, 4.) The Magistrate Judge was able to rule properly on the evidence presented by Sedgwick. Sedgwick failed, however, to carry its burden.

3. The defendant, Sofamor Danek Group, followed this two-pronged attack and filed a similarly styled motion to reconsider and notice of appeal and objections which fully adopted Sedgwick's arguments.

4. Royal's objections also included a motion for reconsideration. Although the motion for reconsideration was not expressly referred to the Magistrate Judge, SDG and Sedgwick's motions for reconsideration were referred, and the undersigned will consider Royal's arguments as well in reconsideration.

ject of the March Order, but granted it as to new documents not previously considered in order to pare down the issues before the court. (Order, May 15, 1998.) The court then allowed Royal additional time to respond to SDG's and Sedgwick's supplemental record and to provide additional analysis of the crime-fraud exception discussed above.[5] SDG and Sedgwick were likewise permitted more time to respond to these arguments.

The court finds that the issues involved in the present motions to reconsider have been fully briefed and will undertake a redetermination of the findings in the March Order in light of the additional factual information provided by Sedgwick and the additional legal argument provided by Royal and SDG.[6]

## FACTS

This lawsuit involves a dispute regarding the extent of coverage provided by an insurance policy issued by Royal against various risks associated with the defendant Sofamor Danek Group, Inc.'s ("SDG") products. The negotiations between the parties were facilitated by Sedgwick, SDG's insurance broker, and Tri–City Brokerage, Inc., a surplus insurance broker familiar with Royal. At the center of the dispute is whether the policy issued by Royal obligates it to provide coverage and pay the defense costs associated with certain orthopedic bone screw claims against SDG. The policy in question was issued on November 24, 1995, and shortly thereafter on February 16, 1996, Royal sent SDG a Reservation of Rights Letter ("ROR Letter").

Royal subsequently filed a declaratory judgement action on December 16, 1996, denying coverage and alleging, among other things, intentional misrepresentations and/or omissions during the policy application pro-

cess. Royal claimed most of the information concerning the coverage sought by SDG was supplied by Sedgwick, SDG's insurance broker.

Royal sought to discover documents generated by Sedgwick before, during and after the negotiations for the insurance policy in hopes of uncovering some evidence that Royal was fraudulently induced into writing the coverage.

Sedgwick withheld a number of the documents [7] requested on the grounds of attorney-client privilege, joint defense privilege and the work product doctrine. Sedgwick also argued in its motion for protective order that the documents were not relevant to the allegations in this action.

## DISCUSSION

As noted in the March Order, because jurisdiction in this case is based on diversity of citizenship, state law supplies the rule of decision and the existence and limits of any privilege must be "determined in accordance with state law." Fed.R.Evid. 501. However, the applicability of the work product doctrine is governed by federal procedure, even in diversity cases. See *United Coal Companies v. Powell Construction,* 839 F.2d 958, 966 (3rd Cir.1988).

### I. The Attorney–Client Privilege

After reviewing the motions for reconsideration, the court finds it necessary to revisit its earlier ruling on the attorney-client privilege.

Royal's motion to reconsider vigorously attacks this court's ruling that Tennessee's corporate attorney-client privilege is not destroyed or waived by including an insurance broker, who is intimately involved in the

---

**5.** The order on the motion to strike specifically limited Royal's memorandum to a discussion of either the supplemental record as it relates to the prior documents or application of the crime-fraud exception to the attorney-client privilege. The court will not consider any other issues presented.

**6.** In determining the motions for reconsideration, the court has considered in excess of 17 separate pleadings, affidavits and exhibits. However, the court has not considered any legal

arguments presented in summary judgment briefs unless the arguments were expressly presented in the discovery dispute briefs.

**7.** The original "Log of Documents Not Produced and Documents Subject to Protective Order" prepared by Sedgwick identified some 205 separate documents. After negotiations among the parties, there are approximately forty documents still in dispute.

underlying transaction, in confidential communications between the insured corporation and its attorney. Royal's opposition to this holding applies equally to all communications regardless of whether they were made during the policy negotiation process, after the issuance of the policy, or following the reservation of rights letter sent in February, 1996.

Primarily, Royal insists that the duty of utmost good faith, or *uberimae fidae*, which governs the formation of insurance contracts requires SDG and Sedgwick to disclose all facts material to the risk being insured. Royal contends that this duty exists "irrespective of any loyalty or working relationship between Sedgwick and SDG" and requires Sedgwick to "betray" SDG, if necessary, to insure full disclosure. Royal further argues that extending the attorney-client privilege to cover Sedgwick is an "unwarranted and unauthorized" distortion of the privilege which serves "to protect fraudulent activities" and creates "a glaring and destructive anomaly in the *uberrimae fidae* doctrine," a cornerstone of the insurance industry in the State of Tennessee.

■ Under Tennessee law, "[g]enerally stated, the insured has the duty to make a fair disclosure of all information material to the risk involved." *First Tennessee Bank Nat'l Ass'n v. U.S. Fidelity & Guar. Co.*, 829 S.W.2d 144, 149 (Tenn. Ct. App.1991). The Supreme Court in *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928) recognized the common law duty of disclosure:

> [i]nsurance contracts are traditionally contracts uberrimae fidei [requiring complete good faith, with no concealment] and a failure by the insured to disclose conditions affecting the risk, of which [the insured] is aware, makes the contract voidable at the insurer's option.

*Id.* at 316, 48 S.Ct. 512. *See also Collins v. Pioneer Title Insurance Co.*, 629 F.2d 429, 433 (6th Cir.1980)(construing Tennessee law). The Sixth Circuit in *Collins* recognized, however, that in "ordinary practice the duty of disclosure has been relaxed," and the insured

is generally asked to complete an application and any information not sought on the application is deemed immaterial. *Id.*

Royal seems to take the position that the duty imposed on the insured to make a full and fair disclosure of all material risks is somehow incompatible with the notion of confidential communications between SDG and its attorneys, or between SDG, its broker, and its attorneys. The court disagrees. Royal's arguments do not distinguish between the insured's duty to provide all material facts to the insurer and the insured's right to solicit legal opinions and advice regarding its coverage needs from its attorneys. Clearly, the insured cannot hide material facts from the insurer by funneling them through its attorney. Nevertheless, the attorney-client privilege does not contain a caveat, either by statute or common law, which would vitiate the confidentiality of the insured's communications with its attorney simply because the subject matter of the communication is advice regarding a contract for insurance. This is not to say that the privilege cannot be waived or destroyed through the inclusion of third parties in the communications, through the application of the crime-fraud exception, or otherwise. In any event, whatever legal duty imposed on the insured and/or the insured's broker does not, by itself, operate to defeat attorney-client confidentiality.

Royal's second argument concerns the propriety of this court's earlier ruling on the attorney-client privilege in the absence of clear authority from the Tennessee Supreme Court or Tennessee General Assembly. Royal asserts that discovery and evidentiary privileges in Tennessee are established and maintained by statute and there is no indication that the Tennessee Supreme Court would invade the realm of the legislature for purposes of extending the attorney-client privilege to cover purported agents or insiders of the corporate client.

As previously noted, the applicability of any testimonial privilege[8] in this diversity

---

8. Tennessee Rules of Evidence 501 states:
Except as otherwise provided by constitution, statute, common law, or by theses or other

rules promulgated by the Tennessee Supreme Court, no person has a privilege to:
(1) Refuse to be a witness;

action is determined by reference to state law. Fed.R.Evid. 501. The attorney-client privilege in Tennessee has been codified as follows:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person, during the pendency of the suit, before or afterwards, to the person's injury.

Tenn.Code Ann. § 23–3–15 (1994). This statute is an embodiment of the common law principles of the privilege. *See* 21 Tenn. Juris. Privileged Communications § 3. Although the Tennessee privilege has long been codified, the state courts have advised that "whether the attorney-client privilege applies to any particular communication is necessarily question, topic and case specific." *Bryan v. State*, 848 S.W.2d 72, 79 (Tenn. Crim.App.1992). For example, the court in *Bryan* held that not only must the communication sought to be protected have occurred pursuant to the attorney-client relationship, it must have also intended to be confidential. *Id.* at 80. Likewise, the *Bryan* court recognized that the attorney's communications to the client "although not specifically addressed in [the statute] are necessarily included in the privilege." *Id.* The *Bryan* court cited Wigmore's treatise on evidence and a federal appellate court decision for this proposition. In addition, the court cited federal law to support the principles that advice based on public information or advice given on general questions of law are not protected. *Id.* And most important to our purposes, the principle that the presence of third parties does not bring the privilege into play is also a result of judicial interpretation. *Id.* (citing *Hazlett v. Bryant*, 192 Tenn. 251, 241 S.W.2d 121 (1951)).

(2) Refuse to disclose any matter;
(3) Refuse to produce any object or writing; or
(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

Tenn. Rule Evid. 501. Professor Paine's treatise on Tennessee Evidence recognizes that the state

In *Hazlett v. Bryant*, 192 Tenn. 251, 241 S.W.2d 121 (1951) the Tennessee Supreme Court was called to determine the competency of an attorney's testimony regarding his client's execution of deed in the presence of the client's niece and husband. *Id.* at 123. The court began by quoting the privilege statute outlined above. *Id.* The court then stated that although the privilege accorded communications between "attorney and client has been long and frequently upheld by the Courts of this State, it has also been frequently recognized that there are many exceptions to this privilege." *Id.* The court held that the attorney was competent to testify about the transaction because communications "which take place in the presence of third persons are not privileged." *Id.* The *Hazlett* court did not expound on this principle. Instead, the majority of the analysis centers around the fact that the nature of the communication itself, a deed transfer, indicated that the client did not appear desirous of secrecy. *Id.*

The only other reported Tennessee decision to deal with the issue of confidentiality of attorney-client communications in the presence of third parties was *Smith County Education Assoc. v. Anderson*, 676 S.W.2d 328 (Tenn.1984). In that case, a county education association brought suit against the board of education for violations of the Tennessee Open Meetings Act when the board met privately with its attorney and its chief negotiator. The court first recognized that many other states have created exceptions to their open meeting laws based on either (1) the evidentiary privilege between lawyer and client; or (2) the attorney's ethical duty not to betray the confidences of his client. In the course of deciding that the former basis had effectively been waived by passage of the Tennessee Open Meetings Act, the *Smith* court first had to determine if the communications were otherwise privileged.[9] The court found that they were, stating:

> rule varies drastically in form, though not in effect, from its federal equivalent. Tennessee Law of Evidence § 501.2 (1995).

9. In *Smith*, the court ultimately found that the Act was not intended to impair the Tennessee Supreme Court's inherent authority to regulate the practice of law. Therefore, since the duty of

The attorney-client evidentiary privilege only extends to communications from the client to the attorney. D. Paine, Tennessee Law of Evidence, § 96, p. 111–112 (1974), and confidentiality is destroyed when those communications take place in the presence of a third party. *Hazlett v. Bryant*, 192 Tenn. 251, 257, 241 S.W.2d 121, 123 (1951). The privilege is designed to protect the client and because it belongs to the client, may be waived by him. When the third party in whose presence such communications take place is an agent of the client, the confidentiality is not destroyed. McCormick § 91 (2d ed.1972); D. Paine, Tennessee Law of Evidence, § 97, p. 112 (1974).

*Id.* at 323.[10]

The foregoing cases clearly indicate that the Tennessee Supreme Court does not consider the scope of the privilege strictly bound by the text of statute. To the contrary, in accordance with the Tennessee Rule of Evidence 501, the courts of Tennessee are often guided by state and federal common law when fashioning the contours of the attorney-client privilege. *See also Federal Insurance Co. v. Arthur Anderson & Co.*, 816 S.W.2d 328, 330 (Tenn.1991) (noting "though presently protected by statute, the rule is rooted in the common law of this State."); *State v. Bobo*, 724 S.W.2d 760 (Tenn.Crim.App. 1981)(In finding that the privilege did not

prevent the attorney from divulging the identity of his client, the court recognized that the privilege is established "by statute and case law," looked to authority from other jurisdictions and cited various treatises as well as federal common law.); *Schneider v. Troxel Manufacturing Co.*, 1988 WL 130351 (Tenn. Ct. App. Dec. 7, 1988)(citing *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) in the context of ruling on the limits of the corporate attorney-client privilege).

■ Royal's motion to reconsider also claims that this court misunderstood its duty in fashioning a rule of decision.[11] The court clearly understands its duty to be to fashion a rule of decision that the Tennessee Supreme Court would most likely adopt if confronted with the issue in the absence of any controlling state law. *Ackley v. Wyeth Labs., Inc.*, 919 F.2d 397, 399 (6th Cir.1990); *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). In fashioning a rule of decision, the court can look to the decisional law of the Tennessee Supreme Court in analogous cases and relevant dicta in related cases, positions expressed in the restatement of law, law review commentaries and decisions from other jurisdictions or the majority rule for guidance. *Bailey*, 770 F.2d at 604.

This brings the analysis of the issue, once again, to the point where this court feels quite confident in looking to other authority

---

client confidentiality is required by the code of professional responsibility which is promulgated by the supreme court, the Act must be read to permit those confidences to continue.

**10.** Royal also submits that the March Order was incorrect in relying on *Smith* since the third party in that suit was a statutorily appointed negotiator acting as the "exclusive legal representative" of the client board of education. The *Smith* court does not make this distinction. The discussion of the matter is limited to the quote set out above.

Tenn.Code Ann. § 49–5–602(9) defines "negotiator" as "the person or persons selected by the board of education and the professional employees' organization to do the negotiating."

§ 49–5–602(13) defines "representative" as "any person, or group of persons, organization or association who is designated and authorized by the respective negotiating unit or local board of education to negotiate and act for it under the provisions of this part."

Neither has to be the exclusive negotiator, neither is mandated by the statute, both can be a person or persons and both can be appointed to act for either the board or the professional employees' organization.

**11.** The March Order stated: "In the absence of any clear authority on point, it is the role of the federal court in diversity cases to consider all of the available legal sources in order to formulate a rule of decision. *See Anderson Development Company v. Travelers Indemnity Company*, 49 F.3d 1128, 1131 (6th Cir.1995)." (Order at 9.)

Evidently, Royal did not reference the Sixth Circuit case cited which stated: "a federal court deciding a diversity case under state law must apply the law of the state's highest court. If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from 'all relevant data.' ... A federal court may in this situation also consider decisions from other jurisdictions." (citations omitted).

for guidance. An exhaustive review of case law and secondary legal sources has served to confirm the March Order's reliance on *In re Bieter,* 16 F.3d 929 (8th Cir.1994) as highly persuasive authority on this issue. Royal's motion to reconsider argues that this reliance is misplaced because *In re Bieter* was decided under the federal common law of attorney-client privilege, which Royal contends is much broader, and because the court in *Bieter* relied on Proposed Rule 503. This first argument has been addressed above. As for the second, Royal reads too much into the *Bieter* court's citation of Proposed Rule 503. The court stated that the rule simply provided a "useful starting place for our discussion." *Id.* at 935. In fact, the most that can be taken from the court's analysis of Rule 503 is the principle that attorney-client confidences can include communications involving a "representative of the client." *Id.* This proposition, however, added nothing new to our analysis. Indeed, the Tennessee Supreme Court had already recognized this possibility in *Smith.* The purpose of examining *Bieter* was for this court to determine precisely what type of representative or agency relationship could justify extension of the privilege.

Subsequent research has reinforced the March Order. In *Miller v. Haulmark Transport Systems,* 104 F.R.D. 442 (E.D.Pa. 1984), the court was faced with a similar situation in a coverage dispute lawsuit. In ruling on a motion to quash an insurance company's subpoena duces tecum, the court held that the presence of a insurance agent at a meeting of the insured and its attorney did not void the privilege. *Id.* at 445. The court in *Miller* noted that the agent had been "instrumental in arranging [the] coverage" and held that the mere presence of one so closely related to the insured and the subject matter of the suit does not void the confiden-

tiality required to give rise to a valid claim of privilege. *Id.*

In a case even more factually similar to the present one, a district court in Illinois denied an underwriter's motion to compel the production of documents in the possession of an insurance broker based on the insured's attorney-client privilege. *Allianz v. Rusty Jones, Inc.,* No. 84 C 10860, 1986 WL 6950 (N.D.Ill. June 12, 1986). The court held the privilege applicable to a letter from the president of the insured's parent company to the insured's attorney even though a copy had also been sent to the insured's principal broker. *Id.* at *3. The court found the affidavit of the president sufficient to explain why a copy of the letter had been sent to the broker. The affidavit stated:

> I added Mr. Henry Revzan, an attorney[12] who is the company's principal broker at the firm of Rollins Burdick Hunter, as a copied recipient of the letter with the purpose and understanding that he would act as Rusty Jones' agent in informing Kirkland & Ellis [the law firm] of the facts necessary for them to render advice on the legal questions raised in my letter. It was necessary to involve Mr. Revzan and certain of his associates in some of my consultations with Kirkland & Ellis because Rollins Burdick Hunter had valuable expertise in the insurance field, exclusive access to the representatives of our insurance carriers and had also been directly involved in the negotiation and administration of our existing policies.

*Id.* Based on this affidavit, the court found the document was disclosed to Rusty Jones' agent for the purpose of obtaining legal advice and as such, was protected by the attorney-client privilege and need not be disclosed. *Id.*

To the same effect is *Exxon Corp. v. St. Paul Fire & Marine Insurance,* 903 F.Supp. 1007 (E.D.La.1995) a case decided under Louisiana law.[13] In that case, Exxon at-

---

12. The fact that the broker was also an attorney did not effect the court's analysis. There is nothing in the opinion to indicate an attorney-client relationship between the broker and the insured.

13. The Louisiana privilege statute closely tracks Purposed Rule 503 mentioned above, however, the Louisiana version provides a definition of the term "representative of the client" as follows:

" '[a] person having authority to obtain professional legal services, or to act on advice so obtained, on behalf of the client' or as '[a]ny other person who makes or receives a confidential communication for the purpose of effectuating legal representation for the client, while acting in the scope of employment for the client.' " *Exx-*

tempted to subpoena documents in the possession of the insurance broker for a third party maritime company. Exxon argued that it was an additional insured under a policy the broker had procured for the third party from St. Paul. Consequently, Exxon sought to discover communications between the broker, the third party, St. Paul and Phelps, Dunbar a law firm representing St. Paul and the third party. Exxon contended the broker should not be considered a representative of the client for purposes of the privilege or the privilege had been waived when the communications were disclosed to the broker. The court disagreed. After conducting an in camera review of the disputed documents, the court concluded that they clearly indicated that the broker was involved in the defense of the underlying claims that formed the basis of the coverage dispute and had acted as a "conduit between the lawyer, the insured and the insurer" for the purpose of effectuating legal representation. *Id.* at 1010. *See generally, Steven L. Young and Brian V. Gray, An Examination of Privilege Issues When Discovery is Sought From Insurance Brokers,* Vol. 7, No. 5 Coverage p. 3 (Sept./Oct.1997).

Based on the foregoing authority and the stated willingness of the Tennessee Supreme Court to permit certain agents of the client to be covered by the attorney-client privilege, the court finds that whatever other infirmities might inflict the confidentiality of communications among SDG, Sedgwick and SDG's attorneys, the presence of an non-employee insurance broker does not, by itself, act to defeat or waive the privilege.

Since the March Order, Royal, SDG and Sedgwick have all submitted various affidavits further detailing Sedgwick's level of involvement in the negotiations for the insurance policy. The degree to which Sedgwick acted as a conduit for information between Royal and SDG cannot be disputed. However, the applicability of the attorney-client privilege requires more than disclosure of information.

As noted above, in order for the attorney-client privilege to apply, the communications must have been for the purpose of securing legal advice and must have been made with the intention of being kept confidential. In this case, SDG employed the brokerage services of Sedgwick in order to obtain products liability insurance coverage. Given the level of litigation then pending against SDG, this transaction undoubtably involved a variety of matters which required SDG to seek legal advice. In addition, as discussed above, the court is willing, as a theoretical matter, to allow Sedgwick to be included in these communications without destroying or waiving the privilege due to its role in facilitating the transaction.

Nevertheless, the court is also cognizant of the fact that much of what was communicated between SDG and Sedgwick was routine business communications dealing with the underlying transaction and is not privileged. Indeed, Sedgwick has already provided hundreds of documents to Royal relating to the SDG account in response to the subpoena. In addition, much of what was communicated to Sedgwick was also done with the understanding that Sedgwick was supposed to pass the information along to Tri–City Brokerage, and then on to Royal. Here again, SDG's affidavits explain that their only contact with Royal throughout most of the negotiations was through Sedgwick and that Sedgwick was responsible for forwarding information on to Royal. Both of these circumstances tend to undermine the requirements for attorney-client privilege set out above and convince the court that an in camera review is appropriate in order to determine whether these communications were for the purpose of securing legal advice and were intended to be kept confidential.

The court has the discretion to order an in camera review of documents that are withheld under a claim of privilege. Although there is a threshold showing required by a party opposing the claim of privilege under the crime-fraud exception, (see discussion below), there is no showing required under ordinary circumstances. *See Federal Election Commission v. The Christian Coalition,* 178 F.R.D. 456 (E.D.Va.1998)(citing *United*

*on,* 903 F.Supp. at 1009 (quoting La.Code Evid. Ann. Art. 506.A. (2)).

*States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)).

## II. *The Crime–Fraud Exception to the Attorney–Client Privilege*

In the alternative, Royal urges this court to conduct an in camera review of many of the documents that Sedgwick claims are protected by the attorney-client privilege in order to determine whether the communications indicate that legal advice was sought, or given, for the purpose committing a fraud. Sedgwick, however, maintains that Royal's allegations of fraud are not supported by the facts, that Royal has failed to make the necessary showing to warrant an in camera review, and that in any event the exception should only apply to documents generated during the negotiation process.

It is well settled that the attorney-client privilege is not absolute. In order for the privilege to apply:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Humphreys, Hutcheson & Moseley v. Donovan,* 568 F.Supp. 161, 175 (M.D.Tenn.1983)(construing Tennessee statute on attorney-client privilege). In this case, the key element is 3(d) "and not ... for the purpose of committing a crime or tort." The parties have not identified, and the court has been unable to locate any state law describing or defining this exception. In the absence of any controlling state authority, it is the role of the federal court in diversity cases to consider all of the available relevant legal sources in order to formulate a rule of decision. *See Anderson Development Com-*

*pany v. Travelers Indemnity Company,* 49 F.3d 1128, 1131 (6th Cir.1995) and discussion above.

The seminal case under federal privilege law describing the appropriate circumstances in which to conduct an in camera review in order to determine the applicability of the crime-fraud exception to the attorney-client privilege is *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). In that case, the Court recognized the attorney-client privilege as the oldest known to common law and noted that the underlying rationale for the privilege was to encourage the frank and open communications between attorneys and their clients and thereby promote the broader public interests in the observance of law and administration of justice. *Id.* at 562, 109 S.Ct. 2619 (*quoting Upjohn Company v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). The Court further noted that the privilege is not without costs since it has the effect of withholding relevant evidence from the factfinder and because of this cost, the privilege should only apply where necessary to achieve its purposes. *Id.* Thus, while the privilege may operate to protect confidences of wrongdoers, the justification for that protection does not extend to cover advice that refers to *future* wrongdoing. *Id.* (emphasis supplied); *In re Antitrust Grand Jury,* 805 F.2d 155, 162 (6th Cir.1986)(noting "[a]ll reasons for the attorney-client privilege are completely eviscerated when a client consults an attorney not for advice on past misconduct, but for legal assistance in carrying out a contemplated or ongoing crime or fraud"). After concluding that neither the Federal Rules of Evidence nor the common law of privileges precluded the use of in camera inspection in order to determine the applicability of the crime-fraud exception, the Court turned to the issue of whether the party asserting the exception must make some threshold showing that such review is appropriate. *Id.* at 565–70, 109 S.Ct. 2619. The Court stated:

> In fashioning a standard for determining when in camera review is appropriate, we begin with the observation that "in camera inspection ... is a smaller intrusion upon the confidentiality of the attorney-client

relationship than is public disclosure." We therefore conclude that a lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege. The threshold we set, in other words, need not be a stringent one.

We think that the following standard strikes the correct balance. Before engaging in camera review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person," that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

*Id.* at 572, 109 S.Ct. 2619.

Once this showing is made, it is within the sound discretion of the district court whether to conduct an in camera review. In exercising this discretion, the *Zolin* Court directed that the district court:

> should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Id.*

■ Taken together, the above passages require the court to conduct a two step analysis. First, the court must require a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review may reveal evidence to establish the exception. Second, the court must make a discretionary decision using the factors set out above. The first step of the analysis should focus only on evidence presented by the party requesting in camera review. *In re Grand Jury Subpoena,* 31 F.3d 826, 830–31 (9th Cir.1994)(citing *Haines*

*v. Liggett Group,* 975 F.2d 81, 96 (3rd Cir. 1992)). The second step, however, expressly allows consideration of "other available evidence then before the court" when exercising the discretion as to whether to grant the in camera review. Thus, although it would be proper to consider evidence offered by the party claiming the privilege, the *Zolin* analysis does not require the court to do so. *In re Grand Jury Subpoena,* 31 F.3d at 830.

■ The crime-fraud exception, however, does not apply to communications which reflect advice sought or given concerning *past* misconduct absent a showing of a continuing cover-up.[14] *Id.* In this case, the fraud would have occurred during the negotiation process and would have been completed when the policy was issued on November 24, 1995.

■ Royal has alleged intentional misrepresentation, omission, fraudulent inducement and mutual mistake in the execution of the policy. Generally, a misrepresentation in insurance is an oral or written statement, made by the insured or his or her authorized agent to the insurer or its authorized agent, of something as a fact which is untrue, is known to be untrue, and is stated with intent, or has a tendency, to mislead or deceive, or which is stated positively as true without its being known to be true, and which has a tendency to mislead, such statement relating in every case to material facts. *Couch on Insurance* 3d § 81:6 (1996). The omission or suppression of facts material to the interest of a party becomes fraudulent only when the other is bound by duty to disclose them. Such a duty arises where the contract or transaction calls for perfect good faith such as a contract for insurance. 13 *Tennessee Jurisprudence, Fraud and Deceit* § 12 (1982). Under the most widely accepted test of materiality, a fact that has been misstated or omitted is deemed material if it could reasonably be considered as affecting the insurer's decision to enter into the contract, or its evaluation of the degree or character of

---

**14.** Although the full effect of the alleged misrepresentations was not realized until SDG first disclosed its intention to allocate *MDL* general litigation expenses to Royal's policy in September, 1996, there has been no showing that this was the result of a cover-up or ongoing misconduct facilitated by advice of counsel.

the risk, or its calculation of the premium to be charged. *Barry R. Ostrager and Thomas R. Newman, Handbook on Insurance Coverage Disputes* § 3.01 (1995).

After a cursory examination of the affidavits offered by Royal, SDG and Sedgwick, the court finds that even if SDG had satisfied its burden with respect to the confidentiality concerns outlined in Section I above, Royal has, nonetheless, satisfied the requirements for obtaining an in camera review of the privileged documents under *Zolin.* Without attempting to fully evaluate all of Royal's allegations of fraud or SDG's defenses to these allegations, the court has reviewed the affidavits and memoranda submitted on this issue and will briefly state why Royal has met the "slight" burden imposed by *Zolin.*

In general, Royal claims that SDG and Sedgwick concealed material information, provided false information, and failed to correct and update information during the negotiation process. Royal's Supplemental Memorandum identifies five specific instances of misrepresentation or omission:

1. SDG failure to advise Royal that SDG would allocate MDL General Litigation Expenses to Royal
2. SDG's failure to report the magnitude of new claims received during the application period
3. SDG's misrepresentation of the level of current and future legal expenses
4. SDG's misrepresentation of the status of the class action
5. SDG's misrepresentation of the purpose and effect of the Designated Product Exclusion

In support of these claims of fraud, Royal has submitted the affidavit of James A. Dixon, the Chief Executive Officer of Royal Specialty Underwriting, Inc. ("RSUI"), the underwriting authority for Royal Surplus Insurance Company. Dixon was the underwriter at RSUI who first received the submission from Tri–City Brokerage [15] regarding the SDG coverage and was responsible for underwriting the file. Dixon's affidavit

details the negotiations between Royal and SDG and reveals that the majority of the communications went from SDG to Sedgwick to Tri–City then to Royal. According to Dixon's affidavit, he was first contacted about the possibility of underwriting the SDG account when he received a submission from Peter Scott, senior vice-president of Tri–City Brokerage, Inc. on October 17, 1995. After several weeks of negotiations over terms and exclusions, the policy was issued on November 24, 1995. Attached to Dixon's affidavit are photocopies of various correspondence sent among the four relating to these negotiations.

1. *The failure to disclose that Royal would be responsible for "MDL General Litigation Expenses"*

Royal cites as the most "egregious misrepresentation or omission" the fact that SDG did not explain to Royal that SDG would allocate general expenses to Royal's claims-made policy. Evidently, SDG separates the legal fees incurred by the bone screw claims into two categories: those fees which are directly attributable to a particular claim and those fees which represent legal work applicable to all the claims. SDG takes the position that this second category, known as MDL general litigation expenses, should be apportioned among the various carriers since it would be unfair to burden one carrier with an expense which benefits the defense of all the claims. SDG developed a formula for computing the percentage of these general expenses that each carrier would be required to pay and has counter-claimed against Royal for its share.

SDG's failure to explain this practice to Royal, in itself, does not necessarily represent an omission of a material fact; instead, it seems more akin to SDG's interpretation of Royal's obligation under the policy to provide a defense. However, if at the time the policy was negotiated, SDG knew it intended to assess a portion of the general litigation expenses to Royal, it may have been a material fact. At any rate, it is a practice SDG had

---

15. Tri–City, a wholesale broker, had been contacted by Sedgwick, a retail broker who was

acting on behalf of SDG.

implemented with other carriers and one which may have heightened SDG's obligation to inform Royal about the recent influx of claims.

### 2. *SDG's failure to inform Royal that it had been served with over 2,000 new lawsuits during October 1995*

Royal argues that SDG failed to disclose that it had been served with over 2,000 new lawsuits in October, 1995.[16] Although these new lawsuits were not covered by the Royal claims-made policy since it was not issued until November 24, 1995, the additional claims would greatly increase the amount of SDG's litigation expenses. As noted above, some of the litigation expenses generated by the new claims would necessarily be classified as "general litigation expenses" and since SDG knew that Royal would be responsible for a percentage of these expenses based on its interpretation of Royal's duty to provide a defense, the new claims could easily be seen as a material fact which increased Royal's risk of loss.

The Dixon affidavit and attached copies of correspondence between Tri–City, Sedgwick and Royal also reveal that Royal repeatedly asked for a listing of outstanding claims prior to issuing the policy. This listing was not provided until December 1995, after the policy had been issued.

### 3. *SDG's misrepresentation of current and future defense cost*

Royal next argues that the two above omissions were further exacerbated by the fact that SDG greatly underrepresented the level of defense costs generated by the bone screw litigation. Royal points to a letter prepared on September 28, 1995, by Rich Duerr, vice-president and general counsel for SDG. Duerr opens the letter with the statement that it is his hope that the letter will provide a means to assess the exposure of SDG to liability in the product liability litigation currently pending. Duerr states that the defense costs should be "at least" $600,-000 for the next few months due to the MDL judge's ambitious discovery schedule, but

that he did not expect the costs to remain at such levels. Royal claims that the defense costs for September 1995 were actually 1.2 million and for October 1995 the cost were 1.9 million. Royal further claims that if it had known the true defense costs and if it had known that it would be expected to contribute a percentage of this cost by way of general litigation expenses, it would not have agreed to issue the policy.

### 4. *SDG's misrepresentation of the status of the Class Action Lawsuit*

Royal claims that SDG misrepresented the status of the pending products liability litigation by referring to it as a "class action" in the submission materials forwarded to Royal in October 1995, although the class had been de-certified by the MDL judge in February, 1995. Royal contends that this misstatement is significant because it did not intend to cover any of the class action losses and expressly maintained its intention throughout the negotiations. Royal further contends that SDG was aware of this misconception since correspondence from Royal consistently refers to the "class action."

### 5. *SDG's misrepresentation as to the purpose and effect of the Designated Products Exclusion*

Royal's final allegation of fraud concerns the drafting of the designated products exclusion contained in the policy. Royal claims that it was the intent of the parties that the policy not cover bone screw claims alleging non-FDA approved uses of SDG's products. Royal further claims that the wording of the exclusion was suggested by SDG and that SDG now claims that the exclusion does not, in fact, exclude bone screw claims alleging non-FDA approved uses. Royal argues that SDG purposefully mislead Royal and induced Royal to accept language that would fail to meet Royal's stated objective. Royal has attached a copy of correspondence sent from Dixon to Scott of Tri–City on November 1, 1995, that states "It is our intent not to cover any of the class action losses tied to the bone

---

**16.** Royal first received the submission from SDG on October 17, 1995, negotiations lasted a little over a month and the policy was issued November 24, 1995.

screw failure currently litigated as well as bone screws as described in the designated products exclusion. This should be the same but I want to be clear on this point."

The exclusion, however, seems to only apply to claims in which it is *determined* that SDG promoted the screws for non-FDA approved usage. Because the policy was written with defense costs outside the limits, the difference between the meaning suggested by the Dixon memo of November 1, 1995, and the apparent meaning of the exclusion as written is quite substantial. Royal wanted the exclusion to cover claims like the ones currently litigated, however, those claims apparently involved more than just allegations that SDG promoted non-FDA approved usage. Therefore, in order for the exclusion to have any effect, the claim would have to contain only the one allegation and it would have to be *determined* that SDG promoted its bone screws for non-FDA approved uses. In any event, Royal would bear the substantial cost of defending the claim even though it might not ultimately be covered.

It is clear that confusion and disagreement exist regarding the effect of the exclusion. It is also clear that Royal did not wish to cover losses associated with bone screw claims like the ones currently litigated, albeit class action or MDL. The affidavit and exhibits also reveal that SDG proposed the exclusion and saw the wording as a critical item.

In sum, the court finds that Royal has presented factual allegations sufficient to support a good faith belief by a reasonable person that in camera review may reveal evidence to establish that the crime-fraud exception applies.

Moving to the second step of the *Zolin* analysis, the court finds that the volume of documents is not excessive or burdensome. Given that the court has narrowed the applicability of the exception to those documents that reflect attorney advice given during the negotiation process, which only lasted some six weeks, it appears as though the court will only be required to review a relatively small number of documents. The court also finds that because the crux of this lawsuit involves alleged fraud and misrepresentation in the

negotiations for the policy, any evidence revealing that SDG and Sedgwick consulted counsel for the purpose of misleading or defrauding Royal would be extremely important to the case.

The final inquiry of the *Zolin* analysis requires the court to determine the likelihood that the documents produced for in camera review, together with other available evidence, will establish that the crime-fraud exception applies. It is at this point that the court may look to the proof offered by SDG and Sedgwick. If the court were to determine that the factual allegations presented by Royal are so controverted or undermined by the evidence offered by SDG and Sedgwick that there was little likelihood that in camera review would establish the existence of the exception, then the court could decline to examine the documents.

In this case, the factual allegations offered by SDG and Sedgwick at best place several of Royal's contentions in dispute. For example, although the submission materials contained inaccurate information about the status of the class action, the materials also plainly stated elsewhere that the class had in fact been decertified. SDG also argues that the delay in providing information about the 2,000 new lawsuits or more accurate information about the current level of defense cost was due to administrative problems with cataloging the incoming suits and tardiness by outside counsel in submitting their bills. With respect to the confusion regarding the designated products exclusion, SDG points to a November 15, 1995 memorandum from Royal that states it is "not intended to exclude all claims surrounding the pedical [sic] screw, only those claims in which it is determined that the insured promoted the product for 'off-label' or non-FDA approved usage." This language mirrored the intent expressed by SDG in proposing the exclusion, however, it is not consistent with Royal's November 1, 1995 memorandum described above. In that communication, Royal explains that its intention was not to cover any claims similar to the ones in the current class action. But, some of the currently litigated claims alleged more than simply promoting the product for non-FDA approved usage. Thus, it would

seem the exclusion only applies to new claims which are similar in this one respect and is contrary to Royal's stated intentions of November 1, 1995.

Weighing all of the relevant factors, the court grants Royal's request to conduct an in camera review of the documents described below. The purpose of the in camera review is to first ascertain whether the communications indicate that they were made in order to secure legal advice and were intended to be kept confidential. If it appears that the communications otherwise qualify for the attorney-client privilege, then the court will examine the documents in order to determine if the crime-fraud exception applies.

### III. The "Trigger Date" for the Joint Defense Privilege and Work Product Doctrine

Sedgwick and SDG's motions to reconsider also assert the March Order erred by holding the protections of the work product doctrine and joint defense privilege were not triggered until Royal sent the Reservation of Rights letter ("ROR") on February 16, 1996. They argue that both protections were established at least by January 8, 1996, or otherwise privileged communications will be unnecessarily disclosed.

The court is not convinced. As stated in the March Order, the need for the joint defense privilege arises out of a need for a common defense, as opposed merely to a common problem. *Medcom Holding Co. v. Baxter Travenol Lab's,* 689 F.Supp. 841, 845 (N.D.Ill.1988). Likewise, when work product is prepared by a potential defendant, he must establish that litigation is reasonably anticipated or apprehended. As stated, the burden is on the party opposing production to demonstrate entitlement to the privilege or protection. In this case, SDG and Sedgwick have been unable to adequately explain why an earlier date would be more appropriate except to point to several internal communications which they hope to protect. The protections in this case should not be dependent on when documents discussing the developing coverage problems were generated.

Instead, the ROR letter provides the court with the clearest indication that the controversy, as it was communicated between the parties, over the recently issued policy was likely to result in litigation.

### IV. Documents previously ruled discoverable

In this court's March Order several documents were held to be discoverable simply because the party claiming the privilege (SDG and Sedgwick) did not carry its burden of demonstrating they were entitled to protection. The court will reconsider the discoverability of these documents in light of the supplemental record provided by Sedgwick, the crime-fraud exception discussed above, and the legal conclusions set forth in the March Order.

### SPECIFIC DOCUMENTS

The following descriptions are based on information provided in the supplemental record as well as in the original motion for protective order. Some of the descriptions and conclusions have not changed. In some instances the description, either provided previously or in the supplemental record, indicates that the document is eligible for in camera review. Based on the crime-fraud exception, in camera review is also appropriate for some documents that were previously ruled privileged. Therefore, the descriptions set out below incorporate the court's conclusion with respect to all the legal arguments previously considered.[17]

1. *S00804*—Handwritten notes prepared by Pera on August 16, 1996, detailing discussions he had with SDG's outside counsel regarding the Policy. Because this court has deemed Pera an insider for purposes of the attorney-client privilege, this document is protected by SDG's attorney-client privilege. The communication took place after the policy was issued and thus the crime-fraud exception is not applicable. In addition, since this conversation occurred after the reservation of rights letter and reflects a discussion concerning potential litigation, there are no

---

**17.** As noted in note 3 *supra,* in accordance with the Order of May 15, 1998, the court did not consider Royal's additional legal arguments presented in the supplemental memorandum.

concerns that the communication was for routine business purposes or was intended to be communicated to third parties.

2. *S01086–99*—Drafts of an August 26, 1996 letter from Pera to Ken Fitzpatrick, an employee of Tri–City, the company that helped broker the deal between Royal and SDG. These drafts were apparently circulated among Pera, Sedgwick's general counsel, Daryll Martin and SDG's outside counsel. The final version of the letter has been produced, however, the drafts were withheld because they contain the handwritten comments of both attorneys. Communications from Pera to Martin, Sedgwick's own attorney, are clearly privileged. Communications from Pera to SDG's outside counsel are also privileged because Pera is an insider at SDG for purposes of this transaction. Also, because of the joint defense privilege, the Pera–SDG privilege would not be waived by including Martin and the Pera–Martin privilege would not be waived by including SDG. Here again, these drafts were created after the ROR letter and reflect mental impressions and conclusions of counsel regarding anticipated litigation. Therefore, the crime-fraud exception does not apply nor is an in camera review necessary to determine whether communications were confidential.

3. *S01257–66*—A cover memo and draft agreement prepared on January 29, 1996, by SDG's outside counsel and directed to the Vice–President/General Counsel and the Treasurer of SDG involving proposals to address disputes with several insurance carriers other than Royal regarding bone screw claims. Royal contends that because this document was also sent to Pera, the attorney-client privilege has been waived. Although Pera has been found to be an insiders for purposes of the attorney-client privilege with respect to SDG's dealings with Royal, the court is not inclined to view him in this posture for all of SDG's insurance dealings. Therefore, this document is to be produced for in camera inspection to determine whether confidentiality was waived by included Pera in discussions about other carriers. In addition, because the memo was prepared before the reservation of rights letter, the joint defense privilege is not available.

4. *S01338–487*—Originally described as 149 pages of handwritten notes by Pera covering various dates and detailing communications "the vast majority being between Sedgwick, its counsel, and Sofamor Danek and its outside and inside counsel related to Royal and other carrier issues and disputes." Approximately forty (40) pages of notes predate the Policy. As to all the notes, Sedgwick claimed protection by the attorney-client privilege and other privileges.

The March Order found that since Pera was an insider for purposes of SDG's attorney-client privilege, the notes which predated the policy would be protected, however, the court stated that a lack of specific information hampered the determination as to whether any of the rest of the notes would be discoverable. The court felt that it could not rule on the rest of the notes since the joint defense privilege and work product doctrine are triggered depending on the date of the communication and all three privileges are dependent upon who shared in the communications. Also, Pera's designation as an insider was only in relation to the subject matter and time frame surrounding the negotiations for the policy and the subsequent controversy which arose regarding the policy's effect. Therefore, the court assumed that the notes which "predated" the policy would necessarily relate to these negotiations and be privileged.[18]

---

18. The supplemental record, however, reveals two flaws in the court's March Order with respect to these early notes. First, a more careful reading of the description of all the notes set out above indicates that Sedgwick was equivocal about precisely who participated in these discussions and this ambiguity is certainly not resolved by Pera's description of "no additional comments" which accompanies many of the entries in the supplemental record. As noted in the March Order, all of the privileges are dependent on two main factors; who participated in the communication and when the communication took place. Without this basic information, the court cannot rule on the privilege. The second flaw in the court's assumption that the forty pages which predated the policy were privileged relates to the time frame implied by the term "predate." The court did not realize until reading the Second Affidavit of Douglas W. Pera that he was involved in supposed confidential communications with SDG's counsel as early as June 22, 1995. (Description of S01401–03, Pera's

A review of the original description and the supplemental record reveals there are several categories of notes within the 149 pages which must be ruled on. Some of the notes post-date the policy and contain sufficient descriptions of the subject matter of the communication and the individuals involved in the discussions to allow the court to determine whether they are privileged. Others post-date the policy and are described as "no additional comments." This is not an adequate description and does not comport with the requirements of Rule 45(d)(2). The court's March Order held that the original description of the post-policy notes was insufficient, so the court fails to see how relying on these prior comments could possibly satisfy the burden imposed by Rule 45(d)(2). Post-policy notes with no descriptions must be produced.

Even more perplexing to the court are those notes which lack both a date and a description. It is impossible to tell whether any of these notes are pre-policy and should therefore be reviewed in camera, or are post-policy and should be produced due to failure to satisfy Rule 45(d)(2). For the most part, the notes seem to be in chronological order, however, there are exceptions and unless a date is provided by the party seeking to assert the privilege, the court cannot assume a particular note is pre- or post-policy. In addition, this is the second opportunity Sedgwick and SDG have had to meet the requirements of Rule 45(d)(2). With respect to many of the 149 pages of notes, they have failed to even make an effort to do so. Those pages which are not described by date, participant or subject-matter are to be produced.

4.1 *S01338–67*—Pera states in his second affidavit that these notes are, for the most part, numbered in chronological order with S01374 being the first notes made after the inception of the policy. Therefore, since these notes predate the policy and relate to conversations Pera had with Sedgwick and SDG attorneys regarding various coverage

issues, they are to be produced for in camera inspection.

4.2 *S01368–73*—There is no description whatever given for these notes in the Pera's second affidavit except the claim that S01374 was the first note produced after the policy and the notes are, for the most part, in chronological order. Pera's first affidavit states that approximately the first 40 pages of S01338–487 predate the policy, and this would seem to encompass this grouping of notes. Since it appears that if there any notes which correspond to these numbers, they most likely predate the policy and are to be produced for in camera review.

4.3 *S01374*—This note is dated December 6, 1995, however, there is no description of the contents of the notes or who participated in the communications which the notes recount. Therefore, it must be produced for in camera inspection.

4.4 *S01375*—This note is dated December 7, 1995, and it relates a conversation between Pera and SDG outside counsel regarding coverage disputes between carriers. It is protected by SDG attorney-client privilege.

4.5 *S01376*—This note is dated January 8, 1996, and it relates conversation among the risk manager at SDG, Pera and SDG outside counsel, Debbie Cohen, regarding wording of a communication to Royal about the meaning of designated products exclusion. It is protected by SDG attorney-client privilege.

4.6 *S01377*—Dated January 9, 1996, however, there is no description of the contents of the notes or who participated in the communications which the notes recount.

4.7 *S01378*—Dated January 10, 1995, [ (sic) presumably, 1996] lines 2–14 relate to a conversation among Pera, two SDG employees and SDG outside counsel and is protected by attorney-client privilege; however, the remainder of the notes are to be produced.

4.8 *S01379*—Dated January 18, 1996, this document contains notes relating conversation between Pera and SDG outside counsel

Second Aff. p. 7.) However, Pera also stated that he did not begin the process of obtaining coverage for SDG until "late July or early August 1995." Regardless of the ultimate disposition of

these early notes, the court will conduct an in camera review in order to determine whether the crime-fraud exception will vitiate any privilege they may otherwise be entitled to.

regarding Royal's coverage. It is protected by attorney-client privilege.

4.9 *S01380*—Dated January 18, 1996, these handwritten notes relate conversation among Pera and two non-attorney employees of SDG. This communication occurred before the joint defense or work product doctrine trigger date and did not involve the advice of an attorney. The claim of privilege fails, and this document is to be produced.

4.10 *S01381, S01382 (lines 30–41), S01384*—Dated approximately January 17, 1996, notes relating conversation between Pera and SDG outside counsel regarding coverage disputes among carriers including Royal's coverage. These notes are protected by attorney-client privilege.

4.11 *S01832 (sic) (lines 44–56) and S01383*—Described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege. These notes are discoverable.

4.12 *S01385*—Same as 4.11 above.

4.13 *S01386–87*—Dated January 23, 1996, S01386 and lines 2–12 of document S01387 are notes from a conversation between Pera and outside counsel for SDG concerning the filing of a coverage lawsuit and are protected by the attorney-client privilege. The remainder of S01387 is discoverable.

4.14 *S01388*—Described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege. This document is discoverable.

4.15 *S01389*—Sedgwick claims this note dated January 26, (1996?), is outside the period of production since the notes deal with future insurance coverage and Royal has not sought to compel production of documents dealing with remote policy years.

4.16 *S01390*—Dated January 26, 1996, before the reservation of rights letter, detailing discussion between Pera and SDG outside counsel regarding coverage dispute and another carrier. It is protected by the attorney-client privilege.

4.17 *S01391*—Dated February 23, (1996?), recounting conversation wherein Mark Merrill, SDG broker, relates discussions with SDG outside counsel Cohen and Rylee about response to reservation of rights letter from Royal. This is protected by both the attorney-client privilege and as work product since it is dated after the ROR letter.

4.18 *S01391*—Dated March 1, (1996?), notes of conversation between Pera and Mark Merrill of SDG regarding analysis of Royal's coverage position. This communication was produced after the reservation of rights letter and is protected by the work product doctrine.

4.19 *S01392*—Dated January 8, 1996, these notes relate to a discussion between Pera and SDG outside counsel about strategy to preserve coverage by Royal. They are protected attorney-client privilege.

4.20 *S01393–1412*—Various notes which predate the policy and are to be produced for in camera inspection in accordance with the crime-fraud exception discussed above.

4.21 *S01413*—Dated April 3, 1996, described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.22 *S01414–19*—Dated April 3, 1996. Lines 26 and 17 of S01414 which relate to discussion between Pera and SDG outside counsel are to be redacted as protected attorney-client privilege. The remainder are to be produced.

4.23 *S01420–24*—Dated April 30, 1996. Lines 2–16 of S01424 are notes of a discussion between Pera and a non-attorney employee of SDG, Mark Merrill, regarding an analysis of a response to excess carrier coverage letter. The response itself was to come from SDG outside counsel. These lines are to be redacted and the remaining documents are to be produced.

4.24 *S01425*—Described as "no additional comments" in the supplemental record which

was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.25 *S01426–30*—These are undated notes from discussions with SDG outside counsel Debbie Cohen and Mark Merrill of SDG regarding variety of issues with carriers, including coverage of the Metzger claim, reimbursement of Stuart Medical defense costs and payment of audit expenses. These are to be produced for in camera review.

4.26 *S01431*—Lines 9–13 relate to information requested by SDG outside counsel Debbie Cohen. These are protected by the attorney-client privilege. The remainder is to be disclosed.

4.27 *S01432–35*—Dated May 17, 1996, recounting discussion among Pera, SDG attorney Debbie Cohen and SDG treasurer Mark Merrill regarding response to Royal's denial of coverage. These notes are protected by attorney-client privilege and work product.

4.28 *S01436–39*—Pera's second affidavit claims that line 18 of S01439 is "totally unrelated and not producible." The remainder of this group of notes is to be produced.

4.29 *S01440–44*—Dated June 11, 1996, described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.30 *S01445*—Notes dated June 19, 1996, are from discussion with SDG treasurer Mark Merrill regarding effect of prior policy exclusion to be discussed with SDG attorney Debbie Cohen. These notes are protected by attorney-client privilege.

4.31 *S01445–46*—These notes are dated June 20, 1996. According to Pera's second affidavit, all of S01445 and lines 1–4 of S01446 involve a discussion with SDG's outside counsel Debbie Cohen and SDG treasurer Mark Merrill regarding Cohen's opinion of the "applicability of the endorsement in prior policy period." As such, these portions are protected by the attorney-client privilege.

4.32 *S01446*—Dated June 21, 1996, described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.33 *S01447*—Dated June 24, 1996, notes from Pera's discussion with SDG general counsel regarding advice on claims procedures. The court is still not convinced that the procedures for handling claims are intended to be a confidential attorney-client communication as opposed to normal business communications which are discoverable.

4.34 *S01448–52*—Dated June 25, 1996, described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.35 *S01453*—Lines 1–14 of these notes dated July 3, 1996, are described as notes of discussion between Pera and SDG treasurer Mark Merrill regarding plans to discuss strategy with SDG attorney. This is protected by the attorney-client privilege since the communication was for the purpose of securing legal advice. Also, the document was prepared by a representative of the client in anticipation of litigation with Royal and is therefore protected by the work product doctrine.

4.36 *S01454–55*—Described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.37 *S01455–56*—Lines 21–28 of S01455 and all of S01456 are dated July 3, 1996, and detail discussions between Pera and SDG's treasurer Mark Merrill regarding Royal's threat of litigation. This document was prepared after the ROR letter and is protected by the work product doctrine.

4.38 *S01457*—Described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.39 *S01458*—Dated July 15 and 16, 1996, relating discussion with SDG's outside coun-

sel Debbie Cohen regarding dispute with Royal over general expenses and legal advice on endorsements, protected by the attorney-client privilege.

4.40 *S01459*—Described as "no additional comments" in the supplemental record which was submitted by SDG and Sedgwick in response to the March Order holding that more specific information was needed to rule on the claims of privilege.

4.41 *S01460*—Dated July 16, 1996, relating discussion with SDG's outside counsel Debbie Cohen regarding contribution from Stuart Medical's insurance carriers. It appears that Stuart Medical was the predecessor of Youngwood Medical Specialties. The court is unclear whether this is a normal business matter or attorney-client communication. These are to be produced for in camera inspection.

4.42 *S01461–67*—Dated July 16, 1996, Pera's second affidavit only describes the last lines of notes on page S01467. There is no evidence offered as to the remaining notes and they are to be produced.

4.43 *S01467–68*—Lines 20–29 of S01467 and lines 2–6 of S01468 are notes from a discussion between Pera and SDG outside counsel Debbie Cohen regarding strategy in dealing with Stuart Medical's carrier, who was denying coverage. Again, the court is unfamiliar with the Stuart Medical insurance situation and will review these documents in camera to determine the applicability of the attorney-client privilege.

5. *S03575–76*—Internal SDG memorandum from the Assistant Treasurer of SDG to an executive with SDG with a copy to SDG's general counsel prepared on February 22, 1995. For all practical purposes, this appears to be a routine business communication for the purpose of summarizing insurance coverage and inherent problems between Royal and SDG. Pera's second affidavit indicates that the memorandum contains opinions and mental impressions of SDG's attorneys, both in-house and outside [19], and was used to communicate their advice to the other employee. The timing of the document places it before the stated negotiation period and too early to come within the crime-fraud exception. Pera stated in his third affidavit that he did not begin the process of renewing SDG's product liability coverage for the 1995–96 policy year until late July or early August 1995. (Third Aff. of Pera at p. 2.) In the same respect, the timing of the memorandum also places it before Pera's involvement began in the negotiation process. As noted above, the court is not inclined to see Pera as a permanent insider for the purpose of SDG's attorney-client privilege and the fact that Sedgwick is in possession of a document which dates back to February 22, 1995, indicates that SDG waived any privilege by including Pera in the confidential communication. This document is, therefore, not protected by the attorney-client privilege and is to be produced.

6. *S06743–44*—Memorandum prepared by Pera on April 30, 1996, detailing a meeting with SDG outside counsel and SDG Treasurer concerning policy coverage. SDG originally advised the court that the document did not "directly implicate SDG's rights and, thus, SDG takes no position." (SDG's Mem. Opp. Royal's Mot. to Compel. at 22.) However, Sedgwick has subsequently informed the court that SDG was mistaken about whose attorney participated in this meeting and that any waiver must have been inadvertent. SDG has filed motions adopting the arguments contained in Sedgwick's memoranda and the court concludes that SDG intends to assert its privilege with respect to this communication. Therefore, this document is protected by SDG'S attorney-client privilege. Since it is dated after the issuance of the policy, the crime-fraud exception would not apply. Although Sedgwick and SDG also claim work product, there is no indication the discussions concerned the anticipated Royal litigation, but just policy coverage issues on bone screw disputes.

---

**19.** Given the early date of this communication, it is unclear to the court what significance SDG's statement that the attorney advice included "opinions and mental impressions" is meant to have. The touchstone of the attorney-client privilege is client confidentiality not the thought processes of attorneys. For example, opinions or mental impressions based on public information are not protected. *See Bryan v. State,* 848 S.W.2d 72, 79 (Tenn.Crim.App.1992).

7. *S06751–52*—Memo prepared by Pera memorializing discussions he had with Sedgwick in-house counsel Daryll Martin sometime in September 1996. In the March Order, this court presumed the discussions were for the purpose of obtaining legal advice. Royal objects to such a presumption and demands in camera review. In his second affidavit, Pera expressly swears under oath the conversation was for legal advice. In light of this affirmation and the fact that no other parties were involved in the communication, there is no need for in camera review. The document is protected by the attorney-client privilege between Sedgwick employees and Sedgwick attorneys. The crime-fraud exception is not applicable because the document postdates the issuance of the policy.

8. *S06997*—Letter from Pera to an officer of SDG with copies to SDG General Counsel and SDG outside counsel, prepared May 13, 1996, discussing the dispute with Royal. In the March Order, the court found that the document was generated while anticipating this litigation, and therefore protected by the attorney-client privilege and also protected by the work product doctrine. Pera's second affidavit details that the letter seeks comments and advice regarding Royal's assertion that SDG failed to report claims properly. Because the date is after is the issuance of the policy, the crime-fraud exception is not applicable. The court's March ruling remains unchanged.

9. *S07037–38*—Memo prepared May 3, 1996, from Pera to his Administrative Assistant, Carol Son, reflecting procedures employed between Sedgwick and SDG's outside counsel relating to the receipt and forwarding and handling of bone screw claims. The claims which are the subject matter of the memo relate to third party product liability claims against SDG and not this litigation. However, the court fails to see how a memo outlining the "procedures" which Sedgwick employees follow in handling bone screw claims is possibly work product generated in anticipation of litigation. Instead, the procedures for reporting claims would appear to be part of the normal business operations of Sedgwick. The court concurs in its earlier ruling that the procedures are not entitled to work product protection and the document is to be produced.

10. *S07057–63* was inadvertently withheld. Sedgwick has agreed to produce, and the issue is moot.

11. *S07094*—This document was described by Sedgwick in Pera's second affidavit as a memo to Pera from his Administrative Assistant on April 3, 1996, "seeking instructions on handling claims which procedure may be the subject of disputes with carriers, including Royal." Here again, the court fails to see how a memo requesting procedures for Sedgwick employees to follow in handling bone screw claims is possibly work product generated in anticipation of litigation. Therefore, no work product protection applies and the document is to be produced.

12. *S07127*—E-mail from Pera to Sedgwick's in-house counsel dated March 20 and 22, 1996, seeking legal opinion with no indication of receipt by third party. Attorney-client privilege of Sedgwick protects it from discovery. Also, because it was generated after the inception of the policy, the crime-fraud exception is not applicable.

13. *S07308*—Undated memo from Carol Son to Sedgwick in-house counsel regarding Sofamor/Surgical Navigation Technologies. According to Pera's second affidavit, this document requests a legal opinion from Sedgwick's in-house attorney and his hand-written response dated June 12, 1996, is on the document. The court finds the document is protected by Sedgwick's attorney-client privilege and the crime-fraud exception is not applicable.

14. *S07469–70*—This is a hand written memo from Daryll Martin, Sedgwick's counsel, to Pera with a post-it note memo from Pera to Son attached bearing the date of December 13. Sedgwick's attorney-client privilege applies and because of the date the crime-fraud exception is not applicable.

15. S07570 is being produced, and motion is moot.

16. *S07581–84*—Originally identified as S07581–92, Pera's second affidavit states that

this is the same as S07698–700 (# 18) which is ruled on below.

17. *S07593–7603*—This is described in Pera's second affidavit as a confidential letter dated November 6, 1995, and stamped "Privileged and Confidential Prepared in Anticipation of Litigation and in Connection with Settlement Discussion" from a Sedgwick vice president in California to SDG's General Counsel with copies via a cover sheet to a SDG executive and Sedgwick assistant General Counsel on November 9, 1995, discussing the organization of "claims" and the negotiations for coverage with SDG carriers from prior years. One page contains Pera's handwritten notes and Pera's affidavit states the information contained therein was provided by SDG's outside counsel. This document predates the policy and is to be submitted for in camera review.

18. *S07698–7700*—Memo from a SDG outside counsel, James Beck, to SDG General Counsel prepared October 2, 1995, regarding the impact of a recent decision, *English v. Mentor Corp.* on bone screw litigation. The March Order held this was work product from other litigation and protected by the attorney-client privilege. The opinion itself is, of course, a matter of public record. However, this document predates the policy and is to be produced for in camera inspection.

19. *S08902–06*—According to Pera's second affidavit, this is a draft letter prepared by SDG outside counsel, S. Phillips, to SDG General Counsel and Pera dated June 21, 1995, regarding bone screw litigation and containing handwritten notes. The March Order held the document protected as work product in other litigation. As noted above, Pera and Forrester both claim that the process of obtaining coverage for SDG did not begin until late July or early August of 1995. Since this court views Pera as an insider protected by attorney-client privilege only for purposes of obtaining legal advice pertaining to the 1995–96 coverage, communications between Pera and SDG counsel before that time would not be privileged. The crime-fraud exception would not be applicable because the letter predates the process of obtaining coverage from Royal, and therefore the letter could not be related to the alleged fraudulent scheme to obtain coverage from Royal. In other words, the crime-fraud exception is not applicable and the ruling remains unchanged.

20. *S09147–48*—This is a letter from SDG General Counsel to a SDG employee in the claims department in Europe on October 19, 1994, with copies to SDG outside counsel and Pera. In the March Order, this court held this document was discoverable. No objections were made to that ruling and it remains unchanged.

21. *S09634–80*—These pages were originally ordered to be produced because Sedgwick had failed to carry its burden under Rule 45(d)(2). The supplemental record has provided ample information that the communications between Pera and Sedgwick's in-house counsel were for the purpose of securing legal advice and were not widely circulated or otherwise disclosed to third parties. The dates of these e-mails are post-policy and place them beyond the reach of the crime-fraud exception. In addition, Royal has offered no arguments which justify compelling their production. These documents are protected by Sedgwick's attorney-client privilege.

22. *S09693–97*—Memo from Pera to Sedgwick in-house counsel prepared August 29, 1996, and enclosing memo and notes from SDG attorney involving Royal coverage issues. The March Order held these documents are protected by SDG's attorney-client privilege since both Pera and counsel for Sedgwick are insiders and by the joint defense privilege as it was prepared after the ROR letter. The court finds no justification for disturbing that ruling.

23. *S09705*—This is a memo from Pera to Carol Son prepared September 30, 1996, "regarding comments of attorney" involving Royal coverage issues. The Court held this memo was work product, dated after the ROR letter, and after review affirms that determination.

24. *S09766–67*—This is a cover memo dated May 13, 1996, from Pera to Son enclosing a letter from Pera to SDG's risk manager regarding a response to Royal's correspon-

dence concerning claims. Copies were sent to SDG's General Counsel and to SDG's outside counsel seeking their input. The March Order found the document was prepared by a party representative in anticipation of litigation and protected as work product and now reaffirms that ruling.

25. *S09777–78*—S09777 is a cover letter dated March 20, 1996 requesting S09778 be sent. S09778 is a letter from Pera to Debbie Cohen, SDG outside counsel, regarding a voluntary document exchange with Royal. In the March Order, the court held the document was discoverable because SDG's attorney-client privilege had not been claimed and there was no indication of the date of the document to allow a determination of work product. Pera's second affidavit provides a date of March 20, 1996, which places this document within the realm of work product. There has been no showing by Royal of undue hardship or inability to obtain the information contained therein through other means. It is, therefore, not discoverable.

26. *S09779*—This is a memo to Pera from his assistant referencing a conversation with an attorney concerning Royal coverage issues prepared March 19, 1996. Even though no attorneys are identified by name, the court still finds the memo is protected as work product. (See # 23 above.)

27. *S09870*—Same description and analysis as # 26 above.

28. *S09896*—The second affidavit of Pera indicates that this document is identical to S09767 described in # 24 above.

29. *S09901*—The second affidavit of Pera indicates that this document is identical to S09679 described in the grouping of documents at # 21 above.

30. *S09908*—The second affidavit of Pera indicates that this document is identical to S09779 described in # 26 above.

31. *S09915*—The second affidavit of Pera indicates that this document is identical to S09657 described in the grouping of documents at # 21 above.

32. *S09916*—E-mail dated February 16, 1996, from Pera to Mark Forrester, a vice president and broker who, along with Pera,

was responsible for the SDG account, with a copy sent to Daryll Martin, Sedgwick in-house counsel. In his first affidavit, Pera states generally he consulted with Martin for legal advice regarding the Royal coverage disputes. Pera's first affidavit does not include any additional information about this specific document. His second affidavit adds "no further comment." The court still lacks an explanation of the subject matter of the communication. Was the subject matter the Royal dispute? The document is to be produced.

33. *S09923*—The second affidavit of Pera indicates that this document is identical to S09655 described in the grouping of documents at # 21 above.

34. *S09928*—The second affidavit of Pera indicates that this document is identical to S09654 described in the grouping of documents at # 21 above.

35. *S09930*—The second affidavit of Pera indicates that this document is identical to S09658 described in the grouping of documents at # 21 above.

36. *S09935–39*—According to Pera's second affidavit, this is an e-mail from Pera to Martin, Sedgwick's in house counsel, prepared August 29, 1996, seeking comments on an attached draft letter to Tri–City responding to Royal's allegations. The March Order found this document protected by Sedgwick's attorney-client privilege and the joint defense privilege since it was prepared after the ROR letter. The court sees no reason to change the earlier ruling.

37. *S09985*—This is an e-mail from Pera to his assistant, Carol Son, and another account executive with Sedgwick prepared December 15, 1996. Sedgwick claims attorney-client privilege. Pera's second affidavit indicates the document is identical to S09680 described in the grouping of documents # 21 above. Although the communication is between non-lawyers, Pera maintains that the purpose of the communication was to relay information Sedgwick's counsel had requested "in order to respond to request involving Royal dispute." As previously stated, the communication does not lose its protected status simply because a corporate employee

conveys the attorney's advice to other protected employees. *See Shriver v. Baskin–Robbins Ice Cream Co.*, 145 F.R.D. 112, 114 (D.Colo.1992). The document is protected by the attorney-client privilege.

38. *S09986*—The second affidavit of Pera indicates that this document is identical to S09676 described in the grouping of documents at # 21 above.

39. *S09987*—The second affidavit of Pera indicates that this document is identical to S09677 described in the grouping of documents at # 21 above.

40. *S09988*—The second affidavit of Pera indicates that this document is identical to S09678 described in the grouping of documents at # 21 above.

## CONCLUSION

Upon reconsideration, both the Motion to Compel and the Motion for Protective Order are granted in part and denied in part as summarized below. Sedgwick James is directed to deliver to the court the documents designated for in camera review within ten days of the date of this order and to produce to Royal for inspection the documents designated as discoverable.

Any appeal from the legal conclusions in this order must be filed within ten days of entry of this order as required under Local Rule 72.1(c) and will stay the submission and production of the documents.

IT IS SO ORDERED.

## SUMMARY

| Document No. | March Ruling | Privilege | July Ruling | Privilege |
|---|---|---|---|---|
| 1. S00804 | Not Discoverable | AC | Same | Same |
| 2. S01086–99 | Not Discoverable | AC, JD | Same | Same |
| 3. S01257–66 | Not Discoverable | AC | Same | Same |
| 4. S01338–487 | Partially Discoverable | AC | | |
| 4.1. S01338–67 | | | Produce for Inspection | Possible AC/Crime Fraud |
| 4.2. S01368–73 | | | Produce for Inspection | |
| 4.3. S01374 | | | Produce for Inspection | |
| 4.4. S01375 | | | Not Discoverable | AC |
| 4.5. S01376 | | | Not Discoverable | AC |
| 4.6. S01377 | | | Discoverable | |
| 4.7. S01378 | | | Lines 2–14 not discoverable. Remainder is discoverable. | AC |
| 4.8. S01379 | | | Not Discoverable | AC |

| Document No. | March Ruling | Privilege | July Ruling | Privilege |
|---|---|---|---|---|
| 4.9. S01380 | | | Discoverable | |
| 4.10. S01381 S01382 (11.30–41) (11.30–41) S01384 | | | Not Discoverable | AC |
| 4.11. S01382 (11.44–56) S01383 | | | Discoverable | |
| 4.12. S01385 | | | Discoverable | |
| 4.13. S01386 S01387 (11.2–12) | | | Not Discoverable (Remainder of S01387 discoverable) | AC |
| 4.14. S01388 | | | Discoverable | |
| 4,15. S01389 | | | Not Discoverable | Irrelevant |
| 4.16. S01390 | | | Not Discoverable | AC |
| 4.17. S01391 | | | Not Discoverable | AC/WP |
| 4.18. S01391 | | | Not Discoverable | AC/WP |
| 4.19. S01392 | | | Not Discoverable | AC |
| 4.20. S01393– S01412 | | | Produce for Inspection | Possible C/F |
| 4.21. S01413 | | | Discoverable | |
| 4.22. S01414– S01419 | | | S01414 (11.26–27) not discoverable. Remainder is discoverable. | AC |
| 4.23. S01420– S01424 | | | S01424 (11.2–16) not discoverable. Remainder are discoverable | AC |
| 4.24. S01425 | | | Discoverable | |
| 4.25. S01426– S01430 | | | Produce for Inspection | |

| Document No. | March Ruling | Privilege | July Ruling | Privilege |
|---|---|---|---|---|
| 4.26. S01431 | | | 11.9–13 are not discoverable. Remainder is discoverable. | AC |
| 4.27. S01432–S01435 | | | Not Discoverable | AC/WP |
| 4.28. S01436–S01439 | | | Line 18 not discoverable. Remainder are discoverable. | Irrelevant |
| 4.29. S01440–S01444 | | | Discoverable | |
| 4.30. S01445 | | | Not Discoverable | AC |
| 4.31. S01445–46 | | | S01445 & 11.1–4 of S01446 are not discoverable. Remainder of S01446 is discoverable | AC |
| 4.32. S01446 | | | Discoverable | |
| 4.33. S01447 | | | Discoverable | |
| 4.34. S01448–S01452 | | | Discoverable | |
| 4.35. S01453 | | | 11.1–14 not discoverable. Remainder is Discoverable | AC/WP |
| 4.36. S01454–S01566 (11.1–20) | | | | |
| 4.37. S01455 (11.21–28)–S01456 | | | Not Discoverable | WP |
| 4.38. S01457 | | | Discoverable | |
| 4.39. S01458 | | | Not Discoverable | AC |
| 4.40. S01459 | | | Discoverable | |
| 4.41. S01460 | | | Produce for Inspection | |

| Document No. | March Ruling | Privilege | July Ruling | Privilege |
|---|---|---|---|---|
| 4.42. S01461–S01467 (11.1–19) | | | Discoverable | |
| 4.43. S01467 (11.20–29) S01468 (11.2–6) | | | Produce for Inspection | |
| 5. S03575–76 | Discoverable | | Same | |
| 6. S06743–44 | Discoverable | | Same | |
| 7. S06751–52 | Not Discoverable | AC | Same | Same |
| 8. S06997 | Not Discoverable | AC, WP | Same | Same |
| 9. S07037–38 | Discoverable | | Same | |
| 10. S07057–63 | Inadvertently Withheld | | Same | |
| 11. S07094 | Discoverable | | Same | |
| 12. S07127 | Not Discoverable | AC | Same | Same |
| 13. S07308 | Not Discoverable | AC | Same | Same |
| 14. S07469–70 | Not Discoverable | AC | Same | Same |
| 15. S07570 | Is being produced | | Same | |
| 16. S07581–92 | Discoverable | | Produce for Inspection | |
| 17. S07593–7697 | Partially Discoverable | AC | Produce for Inspection | |
| 18. S07698–7700 | Not Discoverable | AC, WP | Produce for Inspection | |
| 19. S08902–06 | Not Discoverable | WP | Same | Same |
| 20. S09147–48 | Discoverable | | Same | |
| 21. S09634–80 | Discoverable | | Not Discoverable | AC |
| 22. S09793–97 | Not Discoverable | AC, JD | Same | Same |
| 23. S09705 | Not Discoverable | WP | Same | Same |

| Document No. | March Ruling | Privilege | July Ruling | Privilege |
|---|---|---|---|---|
| 24. S09766–67 | Not Discoverable | WP | Same | Same |
| 25. S09777–78 | Discoverable | | Not Discoverable | WP |
| 26. S09779 | Not Discoverable | WP | Same | Same |
| 27. S09870 | Not Discoverable | WP | Same | Same |
| 28. S09896 | Discoverable | Same as #24 | Not Discoverable | WP |
| 29. S09901 | Discoverable | Same as #21 | Not Discoverable | AC |
| 30. S09908 | Discoverable | Same as #26 | Not Discoverable | WP |
| 31. S09915 | Not Discoverable | AC - Same as #21 | Not Discoverable | AC |
| 32. S09916 | Discoverable | | Same | |
| 33. S09923 | Discoverable | Same as #21 | Not Discoverable | AC |
| 34. S09928 | Not Discoverable | AC - Same as #21 | Same | Same |
| 35. S09930 | Not Discoverable | AC - Same as #21 | Same | Same |
| 36. S09935–39 | Not Discoverable | AC, JD | Same | Same |
| 37. S09985 | Discoverable | | Same | |
| 38. S09986 | Discoverable | Same as #21 | Not Discoverable | AC |
| 39. S09987 | Discoverable | Same as #21 | Not Discoverable | AC |
| 40. S09988 | Discoverable | Same as #21 | Not Discoverable | AC |

